# United States Court of Appeals
## For the First Circuit

No. 11-1916

UNITED STATES OF AMERICA,

Appellee,

v.

LAMAR CARRIGAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Torruella, Stahl and Thompson,
Circuit Judges.

Sharon Fray-Witzer, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief for appellee.

July 19,2013

**TORRUELLA, Circuit Judge.** Lamar Carrigan ("Carrigan") pled guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He did so without a plea agreement and without reserving the right to appeal the denial of his motion to suppress the firearm. He was sentenced under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), to 15 years' imprisonment and three years of supervised release.

He appeals his conviction on several grounds. First, he argues that the entry of a guilty plea without a reservation of the right to appeal the denial of his motion to suppress was the result of ineffective assistance of counsel. Second, he contends that he suffered prejudice from the failure to reserve the right to appeal said motion and that the police neither had reasonable suspicion to stop him nor probable cause to arrest him. Finally, regarding his sentence, Carrigan argues that he does not qualify as an armed career criminal ("ACC"), and that the ACCA's residual clause is unconstitutionally vague. We affirm.

## I. Factual and Procedural Background

According to 911 call transcripts, at 1:30 a.m. on February 1, 2008, the Boston Police Department ("BPD") received a 911 call from a motorist who said that the driver of an Acura had pulled up alongside him and identified himself as "the Boston Police" at the intersection of Columbia Road and Washington Street in Boston. The driver of the Acura asked if the motorist was

-2-

alone, then told him to pull over.  When the caller pulled his vehicle over, the driver of the Acura got out of his car, approached the motorist's vehicle and pointed a gun at the motorist's face.  The motorist put his car in drive and sped away.  Soon after, the Acura sped past the motorist down Quincy Street toward Beverly.  The caller reported to the 911 operator that he was following the Acura and its license plate number was 446A20.  The motorist said the color of the Acura was navy blue or black, and identified the driver as a black man wearing a sideways, brown-and-blue hat (which he also described as two-toned), a black leather jacket and baggy jeans.  The caller told the dispatcher his name was Jasmanie González, a name the police could not later find by searching police records.  He also provided his phone number so he could be called back.

When the 911 dispatcher called the motorist back and asked him where he was because an officer needed to take a report, the caller stated that he was in Roslindale.  However, he did not provide his home address, declined to file a police report and refused to be involved in the matter any further.  The dispatcher called the motorist a second time for additional information before broadcasting the report to police units in the area.  The dispatcher detailed the incident and gave the caller's description of the car, driver, and the reported license plate number.

According to BPD Sergeant Thomas Brooks' testimony during the suppression hearing, ten minutes after the dispatcher's broadcast, Sgt. Brooks observed a vehicle fitting the description of the car described by the caller parked on Southwood Street, Boston, a short distance from a pub. The car was unoccupied. Sergeant Brooks reported the car's license plate number to the dispatch as 446AT2. The dispatcher then responded that the car was registered to an owner in Norwell. Another officer then broadcast that he believed the car was used by "Lamar Carrington," who was not the registered owner reported by dispatch. At this time, more officers arrived in the area, including Sergeant Detective John Fitzgerald, who was in plain clothes and driving an unmarked police car. Fitzgerald, who also testified, parked across the street from the Acura. Several marked police cars waited by the nearby intersection of Southwood and Edgewood, where the Acura would most likely have to pass.

Just before 2:00 a.m., Fitzgerald broadcast over the radio that he saw the lights in the Acura turn on, indicating that the car was being unlocked by remote control. Soon after, a black male wearing a hat, leather jacket and jeans entered the vehicle and began driving toward the intersection where the marked BPD cars waited. Fitzgerald followed the Acura, maintaining a distance of 60 to 70 feet. As the Acura came around a curve, it was possible for the driver to see the marked cars at the intersection. The

-4-

driver of the Acura then made a right turn and pulled into a residential driveway, driving to the very end of it and turning the car's lights off. Fitzgerald stopped his car and told all officers in the area to "stand by."

The driver backed down the driveway, opened his door briefly, and then accelerated back up the driveway. Several officers, some with their weapons drawn, approached the vehicle. The officers identified themselves as Boston Police and told the driver to raise his hands. One of the officers opened the passenger's side door, turned off the ignition, and put the car in park. Another officer then pulled the driver, who was later identified as Carrigan, out of the driver's side door. Carrigan was handcuffed, pushed to the ground, and pat-frisked. The officers found a loaded semi-automatic firearm in Carrigan's jacket pocket.

On November 18, 2010, after being indicted on one count of being a felon in possession of a firearm, Carrigan filed a motion to suppress the firearm and ammunition, alleging that they were the result of an unlawful search and seizure. Carrigan contended that the officers lacked probable cause to arrest him and lacked reasonable suspicion to even stop him. The district court held a hearing on February 8, 2011, on Carrigan's motion to suppress, where some of the recorded 911 calls were played. The judge stated that there was not much of a question on the

reasonable suspicion point, and that it was likely that probable cause for the arrest would be established as well, but wanted to listen to the recordings in full before formally disposing of the motion. The judge denied Carrigan's motion to suppress on February 14, 2011, via electronic order, noting that a memorandum would follow.

On March 3, 2011, Carrigan pled guilty. He did so without securing a plea agreement and without reserving the right to appeal the denial of his suppression motion. At the plea hearing, the government noted that Carrigan would be facing a minimum of 15 years in prison because of his status as an ACC. Carrigan's attorney stated to the court that he had explained this to Carrigan, but also said he intended to raise objections to Carrigan's status as an ACC at the sentencing hearing. The court accepted Carrigan's plea.

A Pre-Sentence Report ("PSR") that issued on April 15, 2011, classified Carrigan as an ACC. Carrigan challenged his status as an ACC, arguing that he did not possess the requisite three prior convictions for violent felonies.

Based on Guideline calculations and Carrigan's ACC status, the court sentenced him to the mandatory minimum of 15 years' imprisonment as prescribed by the ACCA. After the sentence was imposed, defense counsel asked the judge to issue the previously promised memorandum regarding the denial of Carrigan's

motion to suppress.  The judge responded with surprise, stating that, because Carrigan had pled guilty shortly after the denial and did not reserve his right to appeal, she had not written a memorandum and would not issue one.

Carrigan filed this timely appeal. We take each of his arguments in turn.

## II. Analysis

## A. Ineffective Assistance of Counsel

Carrigan's first argument on appeal is that his counsel was ineffective because he advised Carrigan to enter a straight plea without informing him of the consequences of not preserving his right to appeal the denial of his suppression motion.  In support of his argument, he posits that his attorney was actually unaware that Carrigan would be unable to appeal the denial of the motion to suppress if he pled without making a reservation. According to Carrigan, it is apparent from the record that his attorney was surprised when the district court stated he would be unable to appeal the order.[1]

---

[1]  Carrigan points to the following exchange, which took place after the sentencing:

> MR. DEMISSIE: Your Honor, we had a motion to suppress hearing, and that was denied, and a finding and rulings have not been filed.
>
> THE COURT: But he's pled guilty. He pled guilty without --
>
> MR. DEMISSIE: Prior to pleading guilty, you had a motion

To show that his Sixth Amendment right to counsel was violated, Carrigan must establish that: (1) his attorney's performance was deficient under an objective standard of reasonableness; and (2) his defense suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668, 687-88, 692 (1984). To demonstrate prejudice, Carrigan must "show a reasonable probability that the end result of the criminal process would have been more favorable" but for defense counsel's deficient performance. Missouri v. Frye, 132 S. Ct. 1399, 1409 (2012); see also United States v. Moya, 676 F.3d 1211, 1214 (10th Cir. 2012). Failure to satisfy one of the Strickland prongs is fatal and, therefore, we are free to tackle either prong first. See United States v. Caparotta, 676 F.3d 213, 219-220 (1st Cir. 2012).

---

to suppress --

THE COURT: No, I understand that, but he pled guilty, not a conditional plea, not a plea that would have preserved his rights, but he pled guilty fully.

MR. DEMISSIE: Yes.

THE COURT: So I didn't finish the findings because once he pleads guilty and doesn't preserve that issue, there's really no issue. This was a full plea, not a conditional one, so I don't think that you have an appellate basis on that at all.

MR. DEMISSIE: From the denial of the motion to suppress?

THE COURT: That's right, because if you want to plea and preserve your legal rights, you have to do it as a conditional plea . . . .

As a general rule, ineffective assistance of counsel claims must be raised via a collateral attack, and not via direct appeal. United States v. Soldevila-López, 17 F.3d 480, 485 (1st Cir. 1994). We have, however, long recognized that "where the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration of an ineffective assistance claim," we can entertain it. Caparotta, 676 F.3d at 219 (quoting United States v. González-Arimont, 268 F.3d 8, 13 (1st Cir. 2001)). Both parties agree that the record is sufficiently developed for this court to determine if Carrigan suffered prejudice by not reserving the right to appeal. For the reasons stated below, we find that the district court correctly denied the motion to suppress and that, therefore, Carrigan fails to show he suffered prejudice. Consequently, we do not reach the question of counsel's ineffectiveness. See Caparotta, 676 F.3d at 219-20.

**B. The Motion to Suppress**

**1. Reasonable Suspicion to Conduct a Terry Stop**

In reviewing the denial of a motion to suppress, we will review findings of fact for clear error and legal conclusions de novo. United States v. Brown, 500 F.3d 48, 58 (1st Cir. 2007). In this case, there are no factual findings for us to review, given that the district court did not have to issue the memorandum setting forth the rationale for its denial of the motion to

suppress after Carrigan pled. We thus review Carrigan's Fourth Amendment claim de novo.

Carrigan first aims to establish that the police unduly relied on the information provided by an anonymous 911 tipster and that they lacked reasonable suspicion to conduct an investigatory stop.

Our inquiry in this regard is, of course, guided by the Supreme Court's watershed decision in Terry v. Ohio, 392 U.S. 1 (1968). In Terry, the Court delineated the baseline test for determining the constitutionality, under the Fourth Amendment, of investigatory stops conducted by police officers. Brown, 500 F.3d at 54. Under Terry, "[p]olice officers may lawfully effect an investigatory stop as long as they can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' such an intrusion." Id. (citing Terry, 392 U.S. at 21). Reasonable suspicion is a concept that lies somewhere between a visceral hunch and probable cause. See Illinois v. Wardlow, 528 U.S. 119, 123 (2000) ("reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence" but still requires "at least a minimal level of objective justification for making the stop"). Whether the officers had enough information to possess reasonable suspicion "must be evaluated through a broad-based consideration of all the attendant

circumstances."  Brown, 500 F.3d at 54 (citing Florida v. Royer, 460 U.S. 491, 500 (1983); United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001)).

As recounted above, a 911 caller reported being the victim of an assault.  He provided a description of the alleged perpetrator of the crime and of the car he was driving, a license plate number, the direction the vehicle was traveling and a phone number where he was successfully reached twice.  He provided some of this information to the 911 operator while the purported perpetrator's vehicle was still allegedly in his sight.  He was then called back twice and twice he recounted the incident in a way that seems reasonably consistent and coherent.

Carrigan argues that the description of the clothes the alleged perpetrator was wearing differed in several aspects from what Carrigan was wearing when the police first observed him approaching the car, and that, in any case, the description was corroborated only in innocent details.  The caller said the perpetrator of the alleged assault was wearing a brown-and-blue hat (which he also described as two-toned), a black leather jacket and baggy jeans.  Sgt. Fitzgerald testified during the evidentiary hearing that, when he first spotted Carrigan coming out of the bar, he was wearing a blue and orange hat (with alternating blue and orange panels all the way around), a brown leather jacket with orange square patches and black jeans.  We think that the

-11-

descriptions sufficiently matched and that, although the caller stated that the hat was brown and blue, and it turned out to be orange and blue, the discrepancy is not so large as to warrant a finding of an improper identification. On the same token, the caller described the jacket as black leather when, according to Sgt. Fitzgerald, it was a leather jacket with brown and orange patches. We, however, do not think the lack of a perfect match is dispositive in this case.

Carrigan further argues that, aside from corroboration of innocent and readily observable details regarding his general appearance, the tipster did not provide information that could be deemed reliable. In fact, he says, the caller only provided a license plate and car type, which are also readily observable elements that could have been used, for example, by someone trying to frame him. He cites United States v. Monteiro, 447 F.3d 39 (1st Cir. 2006), in support of his argument that corroboration of a license plate number does not provide reasonable suspicion. In Monteiro, we reviewed the reliability of a tip received through a third party that included a license plate number for a car that was spotted by police days after the tip was received. We found that the mere offering of a license plate number by a tipster, although providing "a solid means of identi[fying]" the suspect, did nothing to corroborate the tipster's assertion that the suspect had committed a crime. Id. at 47. We also stated, however, that the

-12-

amount of information "required to establish the requisite quantum of suspicion" depends on the reliability of the tip.  Id. at 48. That is, the more unreliable a tip appears, the more information will be required to establish reasonable suspicion.

Carrigan's argument might be stronger if the police had relied solely on the caller's information and moved in to detain Carrigan as soon as they spotted him leaving the bar and walking to the Acura.  But the information that the police had at the time they conducted the Terry stop did not consist of information provided by the 911 caller alone.  Indeed, once Carrigan got into the Acura, the police began observing him.  They saw that, after driving down the street, Carrigan apparently attempted to avoid several police cars that were blocking the upcoming intersection and acted suspiciously when he entered a driveway, drove to the very end of it and shut off the car's lights.  The police then further observed Carrigan back down the driveway almost all the way to the street, open and close his door and drive up the driveway once again.  The Supreme Court has stated that "evasive behavior is another pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 124.  Given what the officers already knew, they reasonably interpreted Carrigan's behavior as unprovoked flight warranting further investigation.  Although it is well-settled that individuals have a fundamental right to be left alone, it is also settled that "[f]light, by its very nature, is not

'going about one's business'; in fact, it is just the opposite." Id. at 125. It was at this point, once they had matched the description provided by the caller and had observed Carrigan behaving suspiciously, that the officers decided to move in.

A broad-based consideration of the different pieces of individual information the police possessed up to the point of the stop leads us to conclude that the officers had reasonable suspicion to initiate a Terry stop. See Brown, 500 F.3d at 54. We emphasize that it is the sum total of the available information that justifies the finding of reasonable suspicion; no single individual piece of information provided by either the caller or by the police's direct observation of Carrigan would be enough, on its own, to justify the Terry stop. We now turn to Carrigan's second argument regarding suppression: that the Terry stop became a de facto arrest, and that the police officers lacked probable cause to arrest him.

## 2. Probable Cause to Make an Arrest

According to Sgt. Fitzgerald, once Carrigan had driven up the driveway a second time, several officers, including himself, approached the Acura. Some of the officers had their guns drawn. The officers yelled to Carrigan to show his hands. Two officers then entered the Acura through the passenger-side door, turned off the engine and took physical control of Carrigan. Once the officers had Carrigan on the ground and on his stomach, they

handcuffed him and patted him down. They discovered a firearm in the front left pocket of his jacket. According to the PSR, Carrigan disobeyed the command to show his hands. Carrigan did not dispute this assertion in his objections to the PSR.

Carrigan argues that, as soon as the officers physically went into the car and pulled him out, the Terry stop became a de facto arrest. He contends that, since the officers lacked probable cause to arrest him, the seizure of the firearm occurred in the context of an illegal arrest and should be suppressed. The government, for its part, argues that the police may take physical control of and handcuff a person without turning a Terry stop into a de facto arrest when it is necessary "to protect their own safety and the safety of others in the area." United States v. Mohammed, 630 F.3d 1, 6 (1st Cir. 2010), cert denied 131 S. Ct. 2127 (2011).

A de facto arrest materializes "when a reasonable person in the suspect's position would have understood, given the circumstances, that he was essentially under arrest." Id.. It can safely be said that when reasonable people are forcefully pulled out of a car and handcuffed, they will generally understand themselves to be under arrest. We have stated, however, that due to the wide and unpredictable array of scenarios officers face in the course of confronting suspects, "the touchstone is the reasonableness of the measure undertaken to quell or confirm the officers' suspicions." Id. (quoting Klaucke v. Daly, 595 F.3d

-15-

20, 25 (1st Cir. 2010)) (alteration and internal quotation marks omitted). When the government intends to justify the use of handcuffs in the context of a Terry stop it must "point to some specific fact or circumstance that could have supported a reasonable belief" that the use of handcuffs was necessary. United States v. Meadows, 571 F.3d 131, 141 (1st Cir. 2009) (quoting United States v. Acosta-Colón, 157 F.3d 9, 18-19 (1st Cir. 1998)).

The government has indeed pointed to specific circumstances that support the officers' reasonable belief that restraining Carrigan with handcuffs was necessary to conduct the Terry stop. It specifically argues that Carrigan had not put the car in park and that the engine was still running when the officers approached the vehicle, which increased the dangerousness of the situation given that he could have used the car as a weapon. The evidence presented during the evidentiary hearing, i.e., Sgt. Fitzgerald's testimony and the photographs of the driveway, established that the driveway was narrow. Sgt. Fitzgerald testified that the space between the fence and the driver side of the car was under 18 inches. The government also points out that the officers suspected that Carrigan was armed and that, if cornered, he could react violently. Given the confined space in which the police encountered Carrigan, the fact that the car was still running and in drive, and the fact that the police officers reasonably suspected that Carrigan was armed, we must conclude that

-16-

the officers acted reasonably in making sure Carrigan was seized and handcuffed as part of the investigatory stop. Therefore, the forceful seizure of Carrigan and the use of handcuffs in this particular case did not turn the lawful <u>Terry</u> stop into a <u>de facto</u> arrest because the officers had a reasonable belief that such measures were necessary to protect their own safety. We now turn to Carrigan's challenge to his sentence.

## C. Sentencing under the ACCA

### 1. Applicable Law

Whether a defendant qualifies as an ACC is a question of law that we review <u>de novo</u>. <u>United States</u> v. <u>Mastera</u>, 435 F.3d 56, 59 (1st Cir. 2006). Accordingly, we review <u>de novo</u> the legal question of whether a prior conviction qualifies as a "violent felony." <u>United States</u> v. <u>Sánchez-Ramírez</u>, 570 F.3d 75, 81 (1st Cir. 2009).

Carrigan pled guilty to being a felon in possession of an illegal firearm. <u>See</u> 18 U.S.C. § 922(g)(1). The ACCA prescribes a 15-year mandatory minimum sentence for an offender who has three prior convictions "for a violent felony or a serious drug offense" when the unlawful possession of a firearm occurred. <u>Id.</u> § 924(e)(1). "Violent felony" is defined as:

> any crime punishable for a term exceeding one
> year . . . involving the use or carrying of a
> firearm, knife, or destructive device . . .
> that: (i) has as an element the use, attempted
> use, or threatened use of physical force
> against the person of another [the force

-17-

clause]; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another [the residual clause].

Id. at 924(e)(2)(B).

In determining whether a prior conviction constitutes a violent felony under the ACCA, courts employ a categorical approach. United States v. Richards, 456 F.3d 260, 262-63 (1st Cir. 2006). We thus determine if the statutory definition of the prior offense fits the ACCA's definitions of "violent felony" under either clause. In performing this categorical inquiry, courts "typically must limit [their] inquiry to 'the fact of conviction and the statutory definition of the prior offense.'" United States v. Moore, 286 F.3d 47, 49 (1st Cir. 2002) (quoting Taylor v. United States, 495 U.S. 575, 602 (1990)); see also United States v. Holloway, 630 F.3d 252, 256 (1st Cir. 2011) ("This approach is deemed categorical because we may consider only the offense's legal definition, forgoing any inquiry into how the defendant may have committed the offense."). If a prior conviction under state law is at issue, "[s]tate court construction of the relevant state law dictates our result." United States v. Hart, 674 F.3d 33, 41 (1st Cir. 2012).

Determining whether a prior conviction falls within the scope of the residual clause is somewhat more difficult when the prior conviction relates to a crime proscribed by a statute that

covers multiple offenses. Holloway, 630 F.3d at 256-57. If that is the case, a set of rules dictates when the conviction may be considered for purposes of the ACCA and when it may not. A court must first determine which offense or offenses served as the offense or offenses of conviction by looking at "a restricted set of documents (e.g., indictment, plea colloquy, jury instructions)." Id. at 257 (quoting Shepard v. United States, 544 U.S. 13, 26 (2005)). When the documents do not identify which of the offenses proscribed was the offense of conviction, the conviction may be used for purposes of the ACCA only when all of the offenses proscribed in the particular statute qualify as violent felonies under the ACCA. Id. If that is not the case, the conviction may not be used as an ACCA predicate. Id.

## 2. Carrigan's prior convictions

Carrigan's prior convictions, all under Massachusetts law, include: (1) a March 1996 conviction for armed robbery; (2) an October 2000 conviction for resisting arrest; (3) a December 2000 conviction for assault with a dangerous weapon; and (4) two May 2006 convictions for assault and battery on a police officer and assault and battery with a dangerous weapon. Carrigan concedes his 1996 conviction for armed robbery is a violent felony for purposes of the ACCA. He argues, however, that his other convictions cannot be considered "violent felonies" under the ACCA in his case because in 2008, when the arrest in this case took place, no court had yet

found those specific offenses to be ACCA predicates.  He thus argues that counting these convictions against him violated his due process rights.  In support of this argument, he cites United States v. Lanier, 520 U.S. 259 (1997), where the Supreme Court explained the fair warning requirement.  He thus requests that the we apply in his case "the canon of strict construction of criminal statutes, or rule of lenity, [which] ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered."  Id. at 266.

Contrary to what Carrigan argues, Lanier stands for the proposition that the due process clause bars the application of a novel construction of a statute where the scope of the statute is ambiguous.  See id. at 267 ("[T]he touchstone [of the due process inquiry] is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.").  Lanier does not apply where the scope of a statute is ascertainable from the plain meaning of its words.  As explained above, the scope of application of the ACCA is fairly clear both under the force clause and the residual clause as to the type of offenses covered.  The fact that at the time Carrigan committed the instant offense no court had found that the specific convictions Carrigan has under his belt were ACCA predicates does not mean that the ACCA was ambiguous at that time

and that the application of the rule of lenity is warranted.  We thus find Carrigan's argument under <u>Lanier</u> unavailing.

As discussed below, two of the convictions in question are ACCA predicates which the district court correctly considered in sentencing him as an ACC.[2]  Those two convictions, plus Carrigan's conviction for armed robbery, which he concedes is an ACCA predicate, properly constitute three prior convictions for violent felonies.  We take each argument in turn.

We first tackle Carrigan's argument that his 1998 conviction for resisting arrest cannot be considered a violent felony under the ACCA.  He argues that the crime of resisting arrest may be committed recklessly, but does not further develop this issue.  In <u>United States</u> v. <u>Weeks</u>, we said that "resisting arrest [under Massachusetts law] qualifie[s] as a 'crime of violence' under U.S.S.G. § 4B1.2 [the career offender guideline], and because that Guideline and the ACCA are similarly worded," a court may treat a conviction for resisting arrest as a violent felony for purposes of the ACCA.  611 F.3d 68, 73 (1st Cir. 2010)

---

[2]  Carrigan also argues that his December 2000 assault with a dangerous weapon conviction should not count under the ACCA since the Boston Municipal Court had determined his guilty plea to be the result of ineffective counsel.  The same municipal court also rejected Carrigan's request to have his plea set aside because Carrigan had not been prejudiced as he would be serving time for the conviction concurrently with another offense.  We need not determine if this conviction would qualify Carrigan as an ACC because we find that his three other violent felony convictions suffice the statutory requirements.

-21-

(citing United States v. Almenas, 553 F.3d 27, 34 n.7 (1st Cir. 2009) ("[F]or both prudential and precedential reasons, we have read [the ACCA] and the almost parallel guideline language at issue [in the guidelines definition of crime of violence] as being in pari passu.")); see also United States v. Hart, 674 F.3d at 41 n.5 (1st Cir. 2012) ("The Sentencing Guidelines' term 'crime of violence' and ACCA's term 'violent felony' are defined almost identically. Accordingly, decisions construing one term inform the construction of the other." (internal citations and quotation marks omitted)).

Furthermore, contrary to what Carrigan argues, the two methods of resisting arrest proscribed by Massachusetts law require knowledge. See Mass. Gen Laws ch. 268, § 32B(a).[3] Both methods fall under either the force clause, see id. § 32B(a)(1), or the residual clause, see id. § 32B(a)(2). Almenas, 553 F.3d at 33, 35.

---

[3]  In pertinent part, Mass. Gen Laws ch. 268, § 32B(a) states:

> A person commits the crime of resisting arrest if he knowingly prevents or attempts to prevent a police officer, acting under color of his official authority, from effecting an arrest of the actor or another, by:
>
> (1)  using or threatening to use physical force or violence against the police officer or another; or
> (2)  using any other means which creates a substantial risk of causing bodily injury to such police officer or another.

(emphasis supplied).

Therefore, we conclude that the district court acted correctly in finding that Carrigan's conviction for resisting arrest could be considered, along with his conviction for armed robbery, as a crime of violence for purposes of sentencing under the ACCA.

We must now determine whether Carrigan's conviction for assault and battery with a deadly weapon and assault and battery of a police officer also count as violent felonies for purposes of the ACCA.

In Hart, we held that assault and battery with a deadly weapon under Massachusetts law categorically qualifies as an ACCA predicate under the ACCA's residual clause. 674 F.3d at 41-44. We reasoned that the offense in question "clearly poses a serious potential risk of injury, comparable to the degree of risk posed by the enumerated offenses [of the residual clause]." Id. at 42. In Hart, we also found that even if a conviction for assault and battery with a dangerous weapon under Massachusetts law may sometimes rest on a recklessness theory, "our analysis under the residual clause is explicitly, and necessarily, limited to the 'ordinary case.'" Id. at 43 (citing James v. United States, 550 U.S. 192, 208 (2007)); see also id. at 43 n.7 (explaining that "[r]egardless of the underlying theory, [assault and battery with a deadly weapon] requires 'general intent to do the act causing injury.'" (quoting Commonwealth v. Appleby, 380 Mass. 296, 308 (1979))). Prior to issuing Hart, we had ruled that assault and

battery with a deadly weapon under Massachusetts law is a violent felony under the career offender guidelines.  See United States v. Glover, 558 F.3d 71, 79-82 (1st Cir. 2009).

Finally, Carrigan argues that the ACCA's residual clause is unconstitutionally vague.  He acknowledges, however, that his arguments may be foreclosed by this circuit's rulings in Weeks, Hart and United States v. Dancy, 640 F.3d 455 (1st Cir. 2011).  He does not offer any new authority and he has not reformulated the vagueness argument in any way that would prompt us to revisit our previous rulings.[4]

### III. Conclusion

For the reasons set forth above, we affirm Carrigan's sentence.

**Affirmed.**

---

[4]  Carrigan filed a Fed. R. App. P. 28(j) letter asking this court to find that his sentence is unconstitutional because the question of his status as an ACC should have been submitted to the jury pursuant to United States v. Alleyne, __ U.S. __, 133 S. Ct. 2151 (2013).  We disagree.  In Alleyne, the Supreme Court stated that Almendarez-Torres v. United States, 523 U.S. 224 (1998), remains good law.  See Alleyne, *10 n.1.  In Almendarez-Torres, the Supreme Court found that, where "the relevant statutory subject matter is recidivism[,]" which "is as typical a sentencing factor as one might imagine[,]" a crime is not being defined and, therefore, the fact of the prior conviction need not be mentioned in the indictment nor submitted to the jury.  Id. at 230.  Therefore, the sentence imposed on Carrigan pursuant to the ACCA was based on a determination of a sentencing factor, not a determination of an element of an offense.