# United States Court of Appeals
## For the First Circuit

No. 13-1892

UNITED STATES OF AMERICA,

Appellee,

v.

LYNCH E. ARTHUR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Kayatta, Baldock[*] and Selya,
Circuit Judges.

Elizabeth Prevett, Federal Defender Office, with whom Jennifer C. Pucci, Federal Defender Office, was on brief, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

August 22, 2014

---

[*]Of the Tenth Circuit, sitting by designation.

**SELYA, Circuit Judge.** The reasonable suspicion that is needed to justify a minimally intrusive police stop is hard to quantify, and there is sometimes a fine line between that degree of suspicion and mere paranoia or a hunch plucked out of thin air. This case requires us to examine that line. After conducting such an examination, we conclude that the district court did not err in finding that the police conduct in this case fell on the right side of the line. We further conclude that the court committed no error in refusing to suppress proffered eyewitness identification evidence. Based on these conclusions, we affirm the denial of the appellant's motions to suppress.[1]

I. BACKGROUND

We briefly sketch the genesis and travel of the case. On October 31, 2011, two armed men robbed a MetroPCS cell phone store in Boston, Massachusetts. Within a matter of minutes, a Boston police officer, Timothy Golden, spotted two men matching the culprits' general description. He stopped the pair, later identified as Ronald Brown and defendant-appellant Lynch E. Arthur, and questioned them. During this conversation, Officer Golden received additional information from other officers that bolstered his suspicions. The men were brought to the scene of the crime and

---

[1] To be precise, the district court granted the motions to suppress in part and denied them in part. This appeal deals only with those requests for suppression that the district court denied. We affirm that denial and do not comment on the other aspects of the motions.

identified by the store clerk in a "show-up" procedure.  Arrests followed.

A federal grand jury sitting in the District of Massachusetts subsequently returned an indictment charging both men with Hobbs Act robbery, see 18 U.S.C. § 1951; possessing firearms and ammunition after felony convictions, see id. § 922(g)(1); and carrying firearms during and in relation to a crime of violence, see id. § 924(c)(1)(A).  A superseding indictment changed the sequence of the charges against the appellant but not their substance.[2]

The appellant moved to suppress.  After an evidentiary hearing, the district court concluded that the stop was justified by reasonable suspicion.  See United States v. Arthur, No. 12-10025, 2012 WL 6531928, at *7 (D. Mass. Dec. 12, 2012).  The court further concluded that, even though the show-up procedure was impermissibly suggestive, the clerk's identification was reliable and therefore admissible.  See id. at *10.

The appellant entered a conditional guilty plea to all three of the charged counts, see Fed. R. Crim. P. 11(a)(2), reserving the right to challenge the district court's refusal to suppress the challenged evidence.  The court sentenced the

---

[2] Because Brown's case followed a somewhat different path and is not now before us, we do not discuss the charges against him.

-3-

appellant to a total of 228 months of immurement. This timely appeal ensued.

## II. ANALYSIS

The appellant musters two assignments of error. First, he argues that there was no reasonable suspicion supporting Officer Golden's initial stop and that the district court's contrary finding was insupportable. Second, he argues that the district court erred in concluding that the store clerk's identification was reliable under the totality of the circumstances. We address these arguments in turn, "accepting the district court's findings of fact to the extent they are not clearly erroneous and subjecting its legal conclusions to de novo review." United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004). This means that, "[a]bsent an error of law, we will uphold a refusal to suppress evidence as long as the refusal is supported by some reasonable view of the record." United States v. Lee, 317 F.3d 26, 29-30 (1st Cir. 2003).

### A. Reasonable Suspicion.

In this case, as in virtually every such case, the existence vel non of reasonable suspicion is factbound. Consequently, "[w]e recount the relevant facts as the trial court found them, consistent with record support." Id. at 30. Our canvass here is limited to the facts known to Officer Golden at the time of the stop.

-4-

The robbery of the cell phone store took place in mid-day, and the robbers fled on foot.  The store clerk (whom they had bound) hopped to the front counter, hit the panic alarm, and initiated a 911 call.  This call prompted a radio dispatch that alerted police in the area to the robbery.[3]

Officer Golden, who was on patrol in his marked cruiser near the robbery scene, headed for the store.  He then monitored a second dispatch informing him that two black men were involved in the robbery and were fleeing on foot down Moultrie St. (a street in close proximity to the robbed store).  The officer proceeded down Moultrie St. and saw a resident raking leaves.  The leaf-raker told Officer Golden that he had just seen two black men running down the street and heading away from the store.  A third dispatch noted that the robbers were armed and wearing dark, heavy clothing.

When Officer Golden reached the end of Moultrie St., he turned left on Allston St. and immediately left again onto Kenwood St. (heading back toward the store).  Just as he turned onto Kenwood St. — approximately an eighth of a mile from the store — Officer Golden noticed two black pedestrians walking in a direction that led away from the crime scene.  The heavier-set man, later identified as the appellant, was wearing a black pea coat and blue jeans.  The leaner man, later identified as Brown, was wearing a

_____

[3] While we include the facts set out in this paragraph as helpful background, we note that they were unknown to Officer Golden at the time.

-5-

maroon or purple hooded sweatshirt and black pants.  About five minutes had elapsed since the first dispatch, and Officer Golden had seen no other people afoot in the area.

The officer stopped his marked cruiser in the middle of the street, emergency lights flashing, and approached the two men. He did not draw his weapon, but he placed his hand on his holster. He told the duo that a robbery had taken place at a nearby cell phone store and explained that they matched the description of the suspects.  He ordered them to show their hands and they complied. The parties agree that, at this juncture, the men were seized within the meaning of the Fourth Amendment.

It is against this factual backdrop that we turn to the contention that Officer Golden lacked the quantum of suspicion required to effect an investigatory stop.  The Fourth Amendment protects persons from "unreasonable searches and seizures."  U.S. Const. amend. IV.  This prophylaxis extends to temporary investigatory detentions falling short of arrest.  See Terry v. Ohio, 392 U.S. 1, 19 (1968); United States v. Chhien, 266 F.3d 1, 5-6 (1st Cir. 2001).  Such a detention, commonly called a Terry stop, does not offend the Fourth Amendment as long as it is "justified at [its] inception" and reasonable in scope, accounting for the "emerging tableau" of information known to the detaining officer.  Chhien, 266 F.3d at 6.

In this instance, the appellant challenges only the justification for the initial stop, not its scope. To be justified at its inception, a <u>Terry</u> stop must be accompanied by "a reasonable, articulable suspicion of an individual's involvement in some criminal activity." <u>United States</u> v. <u>Ruidíaz</u>, 529 F.3d 25, 28 (1st Cir. 2008). The reasonable suspicion standard is a protean one; it defies strict boundaries, requiring "more than a visceral hunch about the presence of illegal activity, [but] less than probable cause." <u>United States</u> v. <u>Brown</u>, 500 F.3d 48, 54 (1st Cir. 2007). "In the last analysis, reasonable suspicion is more a concept than a constant: it deals with degrees of likelihood, not with certainties or near certainties." <u>United States</u> v. <u>Arnott</u>, ___ F.3d ___, ___ (1st Cir. 2014) [No. 13-1881, slip op. at 7].

The Supreme Court has explained that a detaining officer has reasonable suspicion if the totality of the circumstances give rise to "a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>United States</u> v. <u>Cortez</u>, 449 U.S. 411, 417-18 (1981). The factual mosaic "must be evaluated through a broad-based consideration of all the attendant circumstances." <u>Brown</u>, 500 F.3d at 54. Thus, "reasonable suspicion can flourish in the absence of a direct evidentiary link between the suspect and the suspected crime." <u>Id.</u> The focus is on what a reasonable officer, armed with the same knowledge, would

have thought.  See United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007).

After careful perscrutation, we uphold the finding that the stop effected by Officer Golden was accompanied by reasonable suspicion.  At the time of the initial seizure, Officer Golden had received a reliable, though generic, description of the number of suspects and their race, gender, clothing, and approximate location, as well as information about the direction in which they were heading.  The location and direction information was corroborated by an unconnected witness (the leaf-raker).  Just minutes had elapsed since the robbery when the suspects, who mostly matched the description, were encountered just an eighth of a mile from the crime scene, heading in the expected direction.  There were, moreover, no other persons afoot in the area.  Taken in the ensemble, these facts were sufficient to give rise to a reasonable suspicion that the appellant and his companion were the robbers.

We think it virtually unarguable that a reasonably prudent police officer, standing in Officer Golden's shoes and knowing what he knew, would have harbored such a suspicion.  In light of the attendant circumstances, a failure to stop the men and question them briefly would have verged on a dereliction of duty. It follows that the district court's decision upholding the lawfulness of the investigatory stop was free from error.

To be sure, the stop occurred in a majority-minority neighborhood; and the physical description of a black man in dark, heavy clothing might fit a significant percentage of the local population on a late October day.  We agree with the appellant that such a description, standing alone, would likely be insufficient to give rise to reasonable suspicion.  But everything depends on context and, in this instance, the description did not stand alone.  Officer Golden was entitled to rely on the description in combination with other clues: the precise number of robbers, the immediacy of the robbery, the suspects' close proximity to the crime scene, the direction in which the men were headed, and the dearth of others in the critical two-block area.  The totality of the circumstances supported a logical inference that the appellant and his companion were the robbers.  See Lee, 317 F.3d at 31 ("The two men were not only in the right place at the right time, but also fit the suspects' descriptions."); see also United States v. Pontoo, 666 F.3d 20, 28-29 (1st Cir. 2011) (concluding that reasonable suspicion existed to detain the only person walking at 3:30 a.m. in the vicinity of a reported murder where that person fit the general description of the suspect).

The appellant resists this conclusion.  He makes much of what he views as discrepancies between the information available to Officer Golden and the actual appearance of the appellant and his companion at the time of the stop.  For example, he points out that

-9-

he and Brown were walking, not running; that they were on Kenwood St., not Moultrie St.; and that Brown's maroon hoodie was neither "dark" nor "heavy." But to the extent these distinctions have any bite at all, they are not enough to show that Golden lacked reasonable suspicion. We think it entirely plausible (as did the district court) that the robbers might proceed to a nearby street and shed identifying clothing.[4] We are satisfied that, taking into account the totality of the circumstances and the modest burden required to satisfy the reasonable suspicion standard, Officer Golden could plausibly conclude that the men matched the description.

In an effort to blunt the force of this reasoning, the appellant cherry-picks the case law. This approach has limited utility because, as we have said, the presence or absence of reasonable suspicion is apt to be "case-specific." Arnott, ___ F.3d at ___ [No. 13-1881, slip op. at 7]. At any rate, the cases hawked by the appellant do not aid his cause.

To begin, the appellant offers a cramped interpretation of our decision in United States v. Carrigan, 724 F.3d 39 (1st Cir. 2013). He asserts that Carrigan stands for the proposition that the police cannot stop someone based solely on a generic physical description but first must corroborate their suspicions with

_____

[4] In point of fact, dark, heavy clothing was later found strewn in the wake of the suspects' flight.

-10-

observations of erratic or suspicious behavior. But Carrigan involved a 911 report of somewhat dubious veracity, leading the court to suggest that the defendant's "argument [in favor of suppression] might be stronger had police relied solely on the caller's information" without any corroboration. Id. at 46. That dictum has little bearing where, as here, there was not the faintest reason to believe that the store clerk's description lacked credibility and circumstances other than suspicious behavior lent credence to it.[5]

The appellant's attempt to draw an analogy between this case and United States v. Camacho, 661 F.3d 718 (1st Cir. 2011), is equally unpersuasive. There, we held that police lacked reasonable suspicion where the sole basis for detaining the defendant was that he was "observed in a high crime area walking away from the vicinity of a street fight that one caller reported as involving the Latin Kings." Id. at 726 (internal quotation mark omitted). That scenario is at a considerable remove from the facts at hand. Unlike Officer Golden, the police in Camacho were lacking even a basic description of the suspects, and the defendant was simply one among many people walking near the scene of the crime. See id. at 722, 726.

---

[5] The decision in United States v. Brown, 448 F.3d 239 (3d Cir. 2006), is similarly unhelpful to the appellant. There, the police arrested the only two black men at an intersection based on an unreliable location tip and a generic description that the men did not match. See id. at 248, 251. That is simply not this case.

-11-

Let us be perfectly clear.  Ubiquitous or vague physical descriptions or general locations, without more, are not enough to support reasonable suspicion.  But there is more in this case, and we decline the appellant's invitation to view each fact in splendid isolation.  Events occur in a context, and balkanization of the facts serves only to "distort[] reality."  Pontoo, 666 F.3d at 29.  The generic physical description of the suspects in this case, when considered in light of all the attendant circumstances, was constitutionally sufficient to justify an investigatory stop.

## B.  Identification.

We turn next to the district court's refusal to suppress the store clerk's eyewitness identification testimony.  We begin with first principles: the Due Process Clause is implicated by the introduction of eyewitness identifications tainted by "suggestive and unnecessary" identification procedures.  Perry v. New Hampshire, 132 S. Ct. 716, 724 (2012).  The resulting prohibition, however, cannot be applied with too heavy a hand.  Identification evidence should be suppressed on due process grounds only in "extraordinary cases" in which the court "is persuaded that there was a very substantial likelihood of irreparable misidentification."  United States v. Rivera-Rivera, 555 F.3d 277, 282 (1st Cir. 2009) (internal quotation marks omitted).  Unless "the indicators of [a witness'] ability to make an accurate identification are outweighed by the corrupting effect of law

-12-

enforcement suggestion," the evidence, if otherwise admissible, should go to the jury.  <u>Perry</u>, 132 S. Ct. at 725 (alteration in original) (internal quotation marks omitted).

The courts have orchestrated a two-step pavane for considering whether due process requires the exclusion of identification evidence.  See <u>Rivera-Rivera</u>, 555 F.3d at 283. First, the court must ask whether the identification procedure was impermissibly suggestive.  <u>See</u> <u>id.</u>  If not, the inquiry ends.  But if impermissible suggestiveness is found, the second step of the pavane requires the court to appraise the totality of the circumstances and decide whether the identification was nevertheless reliable.  <u>See</u> <u>id.</u>

Courts typically employ five factors to aid in assessing reliability under the totality of the circumstances.  See <u>Neil</u> v. <u>Biggers</u>, 409 U.S. 188, 199-200 (1972); <u>United States</u> v. <u>Henderson</u>, 320 F.3d 92, 100 (1st Cir. 2003).  These factors are "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation." <u>Henderson</u>, 320 F.3d at 100.  Our appraisal here starts with the facts supportably found by the district court.

As previously noted, two men entered the cell phone store to rob it. The leaner of the two approached the store clerk and inquired about a phone. His heavier-set companion walked behind the counter and raised his shirt to display a gun in his waistband. He asked the clerk, "Where's the money?" He added, "Do what we tell you to do and you won't get hurt, we just want the money." The clerk, who was working alone, got her best look at the men when they entered the store; from that point forward, she looked down to avoid eye contact because she was frightened.

The men escorted her into the back room, where the leaner man displayed a gun and told her to get the money. The clerk replied that the money was in the cash register at the front of the store. She was ordered to bring the cash register to the back room, and she complied. Upon her return, the heavier-set man instructed her to place the money in a bag.

With the purloined funds in hand, the robbers tied up the clerk and fled. Within a few minutes, Detective Connolly responded to the crime scene, interviewed the clerk, and obtained a description of the robbers. The clerk was visibly upset but the detective was able to understand her.

After a brief hiatus, Detective Connolly told the clerk that the police "were going to bring somebody back to her to possibly identify; the person may or may not be involved in the incident; it's just as important to clear the innocent as it is to

-14-

identify the guilty parties; and regardless of whether or not [you] make[] an identification, [the police] will continue to investigate the incident."  The clerk acknowledged that she understood these admonitions.

At some point prior to or during the identification procedure, the clerk told Detective Connolly that she wore glasses "for distance."  Because she did not have her glasses with her, Detective Connolly arranged for the suspects to be viewed in close proximity to the store's plate glass window.  The court below found that the clerk was able to see the suspects.  See Arthur, 2012 WL 6531928 at *10 n.9.

The identification procedure was conducted along the following lines.  First, the police brought Brown onto the sidewalk outside the store's plate glass window.  He stood 10 or 12 feet from the window, with two uniformed officers several feet behind him.  After a minute or so, the clerk (who was inside the store near the window) identified Brown as one of the robbers, noting that she recognized his boots and braids.

Next came the appellant's turn.  Detective Connolly again instructed the clerk on identification procedures.  The police then placed the appellant on the sidewalk some 15 to 20 feet outside the window.  Two uniformed police officers stood three to four feet behind him.  The clerk and Detective Connolly remained just inside the front window of the store.  Upon seeing the appellant, the

-15-

clerk immediately shouted, "that's him, that's him."  At that point, her knees began to buckle.[6]

The district court found that the show-up identification procedure was impermissibly suggestive.  See Arthur, 2012 WL 6531928, at *10.  It cited the presence of uniformed police flanking the suspects and the store clerk's subjective belief that the appellant was in handcuffs.  See id. at *9.  The court nonetheless refused to suppress the clerk's identification, holding that the Biggers factors and the totality of the circumstances militated in favor of admissibility.  Id. at *10.

We assume for argument's sake, favorably to the appellant, the accuracy of the district court's conclusion that the show-up procedure was impermissibly suggestive.[7]  We proceed,

---

[6] Although the clerk believed that both suspects were in handcuffs during the identification procedure, there was police testimony to the contrary.  The district court found it unnecessary to resolve this contradiction.  See Arthur, 2012 WL 6531928, at *9.

[7] Withal, we note that the district court did not clearly address whether the suggestive nature of the identification was necessary under the circumstances.  See United States v. Holliday, 457 F.3d 121, 125 (1st Cir. 2006) ("The first prong of the test — whether the identification procedure was impermissibly suggestive — can be broken down into two constituent parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." (internal quotation marks omitted)); United States v. Watson, 76 F.3d 4, 6 (1st Cir. 1996) ("Show-ups that take place immediately after the offense has been committed may be necessary in order to avoid the mistaken apprehension of the wrong person." (citing cases)).  Whether and to what extent this factor, if explicitly considered, might have affected the court's decisional calculus is open to question.

therefore, directly to the Biggers factors and the totality of the circumstances.

The appellant does not gainsay either that the clerk gave an accurate prior description of the suspects or that the crime and the confrontation were close in time. His ire is focused exclusively on the district court's application of the remaining three Biggers factors: opportunity to view the suspect, attention paid, and certainty. He asserts that the court placed too little weight on the witness's fragile mental state and uncorrected vision, and gave too much weight to the witness's confidence in identifying the appellant. We probe these assertions, mindful that the accuracy of the clerk's prior description and the close timing of the crime and the confrontation — two factors that the appellant does not contest — provide strong support for a finding of admissibility.

Turning first to opportunity, we endorse the district court's determination that this factor favors admissibility. See Arthur, 2012 WL 6531928, at *10. The record makes manifest that the clerk had a reasonably good chance to view the appellant during the robbery. This tees up the next factor: the district court supportably found that the clerk paid close attention to the robbers' appearance (as demonstrated by her ability to provide an accurate description). See id. Relatedly, we discern no clear error in the lower court's finding that the unavailability of the

clerk's glasses did "not cut against any conclusion about the reliability of her identification where . . . the [suspects] were brought closer to her for the purposes of identification and there's no suggestion that her lack of glasses for distance impaired her ability to view the robbers during the robbery." Id. at *10 n.9.

As for certainty, the record reveals that the clerk recognized the appellant immediately, evincing a stark and visceral reaction. Even so, the district court appears to have considered the certainty factor as weighing only marginally in favor of reliability. See id. at *10; see also United States v. Jones, 689 F.3d 12, 18 (1st Cir. 2012) ("[A] witness' lack of confidence is certainly a reliable warning sign, while the presence of confidence is probably closer to a neutral factor."), cert. denied, 133 S. Ct. 1278 (2013). We discern nothing amiss in the modest weight accorded this factor by the district court.

The appellant has a broader argument against the admission of the challenged testimony. This argument is premised on emerging social science theory to the effect that stress can hamper eyewitness identification and, concomitantly, that an eyewitness, though highly certain, may sometimes be mistaken. See Perry, 132 S. Ct. at 727; id. at 739 (Sotomayor, J., dissenting). This social science gives pause to any knee-jerk assumption that eyewitness identification testimony, no matter how confidently

-18-

expressed, is necessarily reliable. See id. at 732. That does not mean, however, that such testimony must perforce be excluded — and, in all events, the able district court appears to have been sensitive to these concerns.

We discern no error. Suppressing evidence as a matter of due process is generally thought to be necessary "[o]nly when evidence is so extremely unfair that its admission violates fundamental conceptions of justice." Perry, 132 S. Ct. at 723 (internal quotation marks omitted). Where no such extreme unfairness exists, the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." Id. On this record, we cannot say that the admission of the clerk's identification testimony threatened to work unfairness so egregious as to demand suppression.

That ends this aspect of the matter. We hold that the district court did not err in refusing to suppress the store clerk's eyewitness identification testimony.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we affirm the district court's denial of the appellant's motions to suppress and, therefore, affirm his conviction.

**Affirmed.**