NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0092n.06

Case No. 23-5241

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Mar 01, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CURTIS MITCHELL PAUL, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: COLE, GIBBONS, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** A police officer stopped Curtis Paul after suspecting that he robbed a convenience store. At the time of his detainment, Paul was walking in the vicinity of the crime scene shortly after the robbery occurred, he had a bulge in his right front pocket, and his clothing bore similarities to those worn by the photographed suspect. Paul was not the robber. But he was a convicted felon. And the search of his person uncovered a loaded handgun. For this, Paul was charged with, and pleaded guilty to, being a felon in possession of a firearm. Paul appeals the denial of his motion to suppress the firearm. For the reasons below, we affirm.

**I.**

On February 10, 2021, Detective Joe Jaynes—a 20-year veteran of the Johnson City police department and an FBI task force officer—was at his desk when he heard the emergency tone on his hand-held dispatch radio. The dispatch reported a robbery at a convenience store near East Tennessee State University, and it identified the suspect as a white male who fled on foot.

Detective Jaynes grabbed his radio, got in his unmarked police vehicle, and drove to the crime scene.

While driving, Detective Jaynes heard the radio dispatch describe the suspect as wearing a "bluish hat" and "black gaiter type mask," and that he robbed the store with a ten-inch knife. R. 24, PageID 99, 101. The dispatch also indicated the suspect's height as five feet, two inches, and further indicated that the suspect fled westbound. By the time Detective Jaynes arrived, he received the following images on his department-issued cellphone:

  

D. 17 at pp.4–6. Another officer captured these photographs from the convenience store's security monitor. Because Detective Jaynes viewed the photos on his cellphone, "they weren't very big and the resolution wasn't very good." R. 24, PageID 78, 85. But he was able to discern that the robber wore a "black hat, a black neck gaiter," and a "bright blue jacket" with a "black jacket underneath." *Id.* at 78, 125.

Approximately fifteen minutes after receiving the initial dispatch, Detective Jaynes saw Paul—a white male who stood six feet, three inches tall—walking eastward a block away from the store. "[M]ostly going off the pictures," Detective Jaynes noticed that Paul's appearance

resembled the robber. *Id.* at 100, 117–19. Paul wore "a black hat, a black neck gaiter, a black jacket, and blue jeans," and Detective Jaynes observed a "bulge in his right front pocket." *Id.* at 81. Although Paul was not wearing a bright blue jacket, that did not dispel Detective Jayne's suspicions because, based on his "training and experience," it was "common for robbery suspects to shed outer garments of clothing in an attempt to avoid detection." *Id.* at 79–80, 119.

Detective Jaynes exited his unmarked vehicle, announced himself, and requested that Paul talk to him. Paul refused and Detective Jaynes grabbed his arm. Paul "jerked away" and reached for the bulge in his right front pocket. *Id.* at 88–89. Fearing for his safety, Detective Jaynes pushed Paul against a nearby embankment and called for assistance. After a brief struggle, the officers corralled Paul and patted him down. They discovered a loaded firearm on Paul's person.

An investigation determined that Paul was not the robber. But because he was a felon in possession of a firearm, a grand jury indicted him for violating 18 U.S.C. § 922(g)(1). Paul moved to suppress the firearm, arguing that Detective Jaynes lacked reasonable suspicion to detain him.

A magistrate judge conducted an evidentiary hearing on Paul's suppression motion. Detective Jaynes testified at the hearing. While testifying, Detective Jaynes reviewed a recording of the dispatch transmission along with copies of the above photographs and the security monitor footage to aid in his recollection of the events. After relistening to the transmission, Detective Jaynes conceded that the dispatch had reported the suspect's height and the direction he fled; however, he did not recall hearing those details at the time he responded to the robbery. Detective Jaynes also admitted that the suspect was photographed wearing sunglasses, khaki pants, and black shoes, which differed from the blue jeans and brown work boots worn by Paul.

The magistrate judge issued a report recommending the denial of Paul's motion to suppress, and the district court overruled Paul's objections to the report and recommendation,

adopting it in full. In doing so, the district court found that Detective Jaynes had reasonable suspicion to stop Paul because he "was in the vicinity of the robbery, was of the same race and sex of the suspect and was wearing clothing that in some respects matched that of the suspect." R. 28, PageID 175. Although the district court acknowledged the differences in height and clothing between Paul and the robbery suspect, the district court concluded that those differences either (a) did not factor into Detective Jaynes's decision to stop Paul, or (b) were insufficient to defeat a finding of reasonable suspicion. The district court also credited Detective Jaynes's testimony, based on his experience, that Paul may have shed away the bright blue jacket and sunglasses to avoid detection.

Paul pleaded guilty to the felon-in-possession charge, reserving the right to appeal the denial of his motion to suppress. This appeal followed.

## II.

On appeal from the denial of a motion to suppress, we review factual findings for clear error, viewing the evidence "in the light most favorable to the government," and conclusions of law de novo. *United States v. Sykes*, 65 F.4th 867, 876 (6th Cir. 2023). A factual finding is "clearly erroneous when we are left with the definite and firm conviction that a mistake has been committed." *United States v. Cooper*, 893 F.3d 840, 843 (6th Cir. 2018).

## III.

Paul contends that the district court erred in denying his motion to suppress because the firearm recovered by Detective Jaynes resulted from an unlawful stop. We disagree.

The Fourth Amendment guarantees the "right of the people to be secure in their persons" against "unreasonable searches and seizures." U.S. Const. amend. IV. In criminal cases, we give this amendment teeth through the exclusionary rule, which generally forbids the government from

using at trial evidence procured in violation of the Fourth Amendment. *Herring v. United States*, 555 U.S. 135, 139 (2009).

We must decide whether Detective Jaynes stopped Paul consistent with *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, officers may conduct an "investigatory stop" when there is reasonable suspicion "that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]" *Id.* That said, we require "more than a mere hunch." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (quotation omitted). To evaluate the validity of a *Terry* stop, we consider the "totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (quotation omitted). "That includes the officer's own observations as well as information the officer receives from police reports, dispatch, and fellow officers." *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022). It also "involves commonsense judgments and inferences about human behavior, as well as inferences the officer may draw based on his experience and specialized training." *Id.* (citations and quotation marks omitted). "Even entirely innocent behaviors may establish reasonable suspicion in some circumstances." *Id.* The "question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion[.]" *United States v. Jacob*, 377 F.3d 573, 577 (6th Cir. 2004) (citing *United States v. Arvizu*, 534 U.S. 266, 274–75, 277 (2002)).

Detective Jaynes conducted a valid *Terry* stop. The totality of the circumstances consisted of the following facts when Detective Jaynes stopped Paul: (1) Detective Jaynes observed Paul in the vicinity of the convenience store shortly after the robbery occurred; (2) Paul had a "bulge in his right front pant pocket" that could have been a "knife or possibly money that was collected

from the robbery"; and (3) the photographs Detective Jaynes received showed that some of Paul's clothing bore similarities to those worn by the actual robber. Taken together, these circumstances gave rise to reasonable suspicion that Paul committed the robbery. *See Wardlow*, 528 U.S. at 123. Thus, Detective Jaynes was justified in briefly detaining Paul to investigate those suspicions. *See United States v. Moberly*, 861 F. App'x 27, 30 (6th Cir. 2021) (finding law enforcement had reasonable suspicion to conduct a *Terry* stop where the defendant "admitted" that he had been at, or near, the crime scene and his hair and clothing matched the description of the suspect identified in a 911 call); *United States v. Lindsey*, 114 F. App'x 718, 722–23 (6th Cir. 2004) (finding a *Terry* stop was valid based on: (1) the defendant's location, (2) officer testimony that the defendant matched the description of the suspect given by the dispatch, and (3) officer testimony that the defendant was running in the vicinity of the alleged criminal activity).

Paul responds that the evidence Detective Jaynes relied on when stopping him was insufficient to establish reasonable suspicion. Paul emphasizes the differences in clothing between himself and the photographed suspect, including the "differing pants and shoes" and the fact that he was not wearing a bright blue jacket or sunglasses at the time Detective Jaynes stopped him. But, as the district court found, "not all the photos showed the suspect was wearing khaki pants and shoes." R. 28, PageID 173. As for the bright blue jacket and sunglasses, Detective Jaynes inferred, as his experience and training allowed him to do, *McCallister*, 39 F.4th at 374, that Paul might have discarded those garments to avoid detection. *See United States v. Arthur*, 764 F.3d 92, 98 (1st Cir. 2014) ("We think it entirely plausible . . . that the robbers might proceed to a nearby street and shed identifying clothing.").

Paul also points out that he was walking in the opposite direction than the robber from the convenience store and that he did not run away when Detective Jaynes confronted him. This

argument fares no better.  Viewing the totality of the circumstances, the district court could credit Detective Jaynes's testimony that he has encountered situations where a suspect fleeing the scene of a crime changes his direction of travel.  Further, Paul did not need to exhibit evasive behavior for Detective Jaynes to reasonably suspect his involvement in the robbery.  *See, e.g.*, *Sokolow*, 490 U.S. at 9 (even "wholly lawful conduct" can justify a *Terry* stop).  "Indeed, *Terry* itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.'"  *Id.* at 9–10 (quoting *Terry*, 392 U.S. at 22).

Because Detective Jaynes's stop of Paul was proper, and because Paul makes no separate challenge to the search of his person that uncovered the firearm, the district court did not err in denying Paul's motion to suppress.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's judgment.