In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1122

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MICHAEL J. MORRISON,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-CR-30047--Jeanne E. Scott, Judge.

Argued May 11, 2001--Decided June 20, 2001

Before BAUER, ROVNER, and EVANS, Circuit
Judges.

EVANS, Circuit Judge.  Michael Morrison
contends that his Fourth Amendment rights
were violated by a "Terry" stop which led
to his conviction for bank robbery.

At about 9:30 a.m. on June 22, 2000, a
young man robbed the Union Planters Bank
at 111 South Durkin Drive in Springfield,
Illinois, by standing on a teller counter
and jumping into the teller area. The
robber was described as a black male, in
his twenties, about 5 feet 10 inches to 6
feet tall, with short hair; he was
wearing a white shirt and a red cap.

After the robbery he ran out the front
door, where a bank customer, William
Withers, saw a young black man run south
and jump over a wooden privacy fence
surrounding a parking lot of a
neighboring apartment building. The man
continued to run south and jumped another
fence into a second parking lot serving a
second apartment building. At that point,
Withers saw the man crouch down as if he
were getting into a car. Withers could
not see the car because of the fences.
However, he saw a white-over-red Monte
Carlo leaving the scene and noted the
license plate number.

Police immediately began an intense

investigation. Officers found and spoke to the driver of the Monte Carlo but ruled him out as a suspect because he was significantly older than the robber was described to be. Another dead end included the videotape from security cameras at a nearby gas station, which showed nothing extraordinary.

The officers also retraced the route Withers said the man took and found a $100 and several $10 bills in the first parking lot. They spoke to residents of the first apartment building. A Ms. Carey told them that the previous day at about 9:30 she saw two black men sitting in a black Honda. Because she was the only African-American living in the apartment building, she said she found the presence of the men suspicious and wrote down their license number, which she said was CTONEY1. The officers observed that the location of the car, as Ms. Carey described it, would give the occupants a view of the bank if casing it was what they were up to. Also, the car was observed on the route the robber apparently took to escape from the bank after the robbery. In addition, another resident of the apartment complex, a Mr. Poe, reported that his roommate told him that he was suspicious about a black or blue Honda he had seen parked in the lot at 9:15 the day before the robbery.

Officers also questioned residents of the second apartment building. Two of the residents reported seeing a large brown or reddish car in their parking lot at about 9:30 the day of the robbery.

The information about the cars indicated to the officers that the persons in the cars might have something to do with the robbery. In the words of Sergeant Jeffery Bivens of the Springfield police department,

It indicated to me that chances were it was almost exactly 24 hours prior. It indicated to me that those two people in the vehicle might very well be involved or were involved because of the exact time frame. They were there at the same time in the morning before, they were in the escape route, they had a view of the bank, they could see how it worked; more or less what we call casing a place.

A search was begun for the suspicious

cars. Sgt. Bivens decided that the officers should search the apartment complexes and streets in the surrounding area. As a result of the search, at about 11:20, an unoccupied black Honda with license place CTONEY (close to the witness' statement that it was CTONEY1) was spotted in the parking lot of an apartment building at 304 Dickenson Drive, which is approximately 10 blocks from the Union Planters Bank. Next to the Honda was a 20-year-old, goldish brown Buick, at which point one can only guess that the officers thought things were coming together nicely.

The officers discussed what to do. While this was going on, two black males got into the Honda and drove off. After letting it travel a few blocks, the officers pulled the Honda over. Mr. Toney, the driver, and his passenger, who was Michael Morrison--the defendant in the present case--were informed that the police were investigating a theft and that their car had been spotted in the area of the crime the day before. The men denied that the car had been in the area. The officers then spoke to the men separately outside the vehicle. Toney said the two had just left Morrison's girlfriend's apartment, which was number 8 in the Dickenson Drive apartment building. Morrison, on the other hand, said he had just left his friend Hugh's apartment--number 7. He also said he did not know Hugh's last name. Morrison also said he had lived in apartment 10 in the past.

A few minutes later, a shoe print lifted from the teller counter at the Union Planters Bank was brought to the stop. It appeared to match the shoes worn by Toney, although later it was determined that it was not a match, for good reason as it was Morrison who robbed the bank. The men were asked to accompany the officers to the FBI office to answer questions; they agreed.

Meanwhile, officers secured apartments 7, 8, and 10. They spoke to Ms. Williams, Morrison's girlfriend and the leaseholder of apartment 10. She said the goldish brown Buick in the parking lot belonged to Morrison. When the officers took a close look at the Buick, they saw the remnants of the bank's dye pack in the front seat. Williams also gave the

officers permission to search the apartment in which she lived with Morrison. More evidence of the robbery was found in the closet.

Ultimately, Morrison confessed to the robbery and was charged with bank robbery. He moved to suppress evidence and statement obtained as a result of the investigatory stop of the black Honda, contending that the police lacked a reasonable articulable suspicion to make the stop. The motion was denied. The judge said that the stop was reasonable and that, even if it weren't, the evidence obtained by searching the apartment was not tainted. Williams' consent to search was an intervening act dissipating any possible taint. Following a conditional guilty plea to a charge of robbing the bank, Morrison appeals both bases for the district court decision.

Morrison argues that the police lacked reasonable suspicion to stop the Honda because no one had seen it in the vicinity of the bank on the day of the robbery, and he contends that the only basis for the stop was the race of theoccupants. Our review of the issue is de novo. Ornelas v. United States, 517 U.S. 690, 116 S. Ct. 1657 (1996). We find Morrison's argument unconvincing.

The Fourth Amendment, which protects "against unreasonable searches and seizures," does not shield citizens from heads-up police work. If an officer has probable cause to believe that a person committed a crime, he can arrest that person. See, e.g., United States v. Johnson, 910 F.2d 1506 (7th Cir. 1990). But even without probable cause, police officers can make "Terry stops," investigatory stops limited in scope and executed through the least restrictive means reasonable. Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968). An investigatory stop requires that the officer have a reasonable suspicion supported by articulable facts. A reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690 (1981). It must be more than a hunch. United States v. Tipton, 3 F.3d 1119 (7th Cir. 1993). Analysis of whether a stop was reasonable requires consideration of the totality of

the circumstances known to the officers at the time. United States v. Swift, 220 F.3d 502 (7th Cir. 2000).

What we have here is the police following a trail which led, very quickly, to Morrison. The police knew there was a robbery, so this is not a case where police are surmising that a crime may be occurring. Here, also, a witness saw a black man running from the bank heading toward a parking lot for a neighboring apartment building. They had a general description of the robber. They traced the route and found currency, lending credence to the witness' account. They then interviewed persons in the apartment buildings and were given two descriptions of a dark-colored Honda in the lot of one of the buildings and two descriptions of a large, old, reddish brown car in the other. Both cars stood out to the residents as not belonging where they were parked. Furthermore, a woman in the first building noted that there were two black men in the Honda almost exactly 24 hours before the robbery (the timing is significant ifcasing the bank was what the men were up to); she was a black woman who found the presence of the men suspicious because she knew she was the only black person living in the building. She wrote down the number on the license plate, further proof that she certainly suspected that something nefarious was a possibility. When the police conducted a search in a fairly large area surrounding the bank, in what surely had to seem like more than a mere coincidence, they found the two suspicious cars parked side by side. As an aside, we note that this is not the first getaway car to lead police to the culprits. See, e.g., Swift; United States v. Arrington, 159 F.3d 1069 (7th Cir. 1998). While the police were contemplating what to do, two black men got into the Honda and drove off.

We have no trouble concluding that the officers' suspicions were reasonable and supported a Terry stop of the Honda. Once the men denied that the Honda had been in the apartment building parking lot the day before and then told different stories regarding where they were coming from, the officers' suspicions were increased and the investigation intensified.

Morrison's argument that the only reason for the stop was that he and Toney were black is not convincing. The robber, and the two men in the Honda the day before the robbery, were described as black men. As we have said, the Honda itself bore essentially the license plate number that Ms. Carey had noted. When the police saw two black men drive off in the very Honda that had been identified the day before, they had a reasonable suspicion upon which they could act. When police are searching for a bank robber described as a black male, it is reasonable for them to be looking for a black man. If there had been no description from any witness about the race of the people observed and the police had gone about willy-nilly stopping black men and, in a stroke of dumb luck, stumbled upon Morrison, the argument would have more force. But that is not what happened here. Morrison and his companion had the bad luck in casing the bank to choose to park in apartment parking lots where the residents were apparently believers in Neighborhood Watch. The residents recognized alien cars as well as people who seemed to not live in the complex. When their suspicions were aroused, they noted their suspicions and, when questioned, passed them along to the police.

Morrison's motion to suppress was properly denied and the judgment of the district court is AFFIRMED.