# United States Court of Appeals
## For the First Circuit

No. 16-1877

MS. M., individually and as parent and
legal guardian of O.M., a minor,

Plaintiff, Appellee,

v.

FALMOUTH SCHOOL DEPARTMENT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

Eric R. Herlan, with whom Michael Buescher and Drummond
Woodsum & MacMahon were on brief, for appellants.
Richard L. O'Meara, with whom Rachel W. Sears and Murray,
Plumb & Murray were on brief, for appellees.

January 27, 2017

**STAHL**, **Circuit Judge**.  This case concerns a claim that the Falmouth School Department ("Falmouth" or "School Department") did not provide one of its students, O.M., with a "free appropriate public education" ("FAPE") as guaranteed under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. The complaint centers on O.M.'s individualized education program ("IEP"), which constitutes the "primary vehicle" for a school's delivery of a FAPE under the IDEA.  Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 23 (1st Cir. 2008).  O.M.'s mother, Ms. M., asserts that her daughter's IEP specified that Falmouth would instruct O.M. using the Specialized Program Individualizing Reading Excellence ("SPIRE") system during her third-grade year.[1] She insists that this system constituted a key provision of O.M.'s IEP and, because Falmouth did not provide O.M. with SPIRE instruction, the School Department therefore violated her daughter's right to a FAPE.  Falmouth, for its part, counters that O.M.'s IEP does not mention SPIRE and that any references to it were relegated to ancillary documents which should not be read into the IEP or made a part of the IEP.

After an administrative hearing and a magistrate judge's review of that hearing, the district court agreed with Ms. M. and

---

[1] SPIRE is a teacher directed, systematic, multisensory, synthetic phonics literacy instructional program developed by Orton-Gillingham.

entered judgment in her favor. However, after careful review we reach a contrary conclusion and find that O.M.'s IEP did not mandate that Falmouth use SPIRE, meaning the School Department neither breached the IEP's terms nor denied O.M. a FAPE by foregoing such instruction. Accordingly, we reverse.

## I. Facts & Background

O.M., a now twelve-year-old girl diagnosed with Down syndrome and Attention Deficit Hyperactivity Disorder, lives with her mother, Ms. M., in Falmouth, Maine. She began attending Falmouth Elementary School as a first grader in 2011 where, as a student with multiple intellectual disabilities, she was eligible for a FAPE, i.e., special education and related services structured in compliance with the IDEA that are provided free of charge.[2] Ms. M. now challenges Falmouth's delivery of these services during O.M.'s third-grade year (2013-2014).[3]

---

[2] See 20 U.S.C. § 1401(9) (defining the term "free appropriate education"); 20 U.S.C. § 1412(a)(1)(A) (stating that "[a] free appropriate public education is available to all children with disabilities residing in [a] State between the ages of 3 and 21, inclusive"); 34 C.F.R. § 300.8(a)(1) (defining "[c]hild with a disability" as including a child with "multiple disabilities" and "who, by reason thereof, needs special education and related services"); 34 C.F.R. § 300.8(c)(7) (defining "multiple disabilities" as "concomitant impairments . . . the combination of which causes such severe educational needs that they cannot be accommodated in special education programs solely for one of the impairments").

[3] A state receiving federal funding under the IDEA must offer a FAPE to every disabled child within its jurisdiction. See 20 U.S.C. § 1412(a). Here, it is uncontested that Maine is such a

A. <u>Statutory Framework</u>

To provide an IDEA-eligible child with a FAPE, a school district must first create an IEP for the child and then follow its dictates. See <u>D.B. ex rel. Elizabeth B.</u> v. <u>Esposito</u>, 675 F.3d 26, 34 (1st Cir. 2012). The IEP is a "written statement for each child with a disability that is developed, reviewed, and revised" in accordance with the IDEA. 20 U.S.C. § 1414(d)(1)(A)(i). IEPs are subject to both substantive and procedural requirements, which "can flow from either federal or state law (at least to the extent that the latter is not incompatible with the former)." <u>Lessard</u>, 518 F.3d at 23.

For example, on the substantive front, an IEP must be "individually designed" to suit the needs of a particular child, <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.</u> v. <u>Rowley</u>, 458 U.S. 176, 201 (1982), and must include, "at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered," <u>Lessard</u>, 518 F.3d at 23 (citing 20 U.S.C. § 1414(d)(1)(A), and <u>Lenn</u> v. <u>Portland Sch. Comm.</u>, 998 F.2d 1083, 1086 (1st Cir. 1993)). On the procedural front, the IDEA gives, among other things, parents of qualifying children a right to be

state and that O.M. was entitled to a FAPE during her third-grade year at Falmouth Elementary School.

- 4 -

a part of the IEP "team," or the group of individuals charged with formulating a child's particular IEP. 20 U.S.C. § 1414(d)(1)(B). Other members of the IEP team can include the child's regular special education teachers, a local education agency representative, other individuals with relevant experience, and, if appropriate, the child him or herself. Id.

Another procedural requirement, the so-called "Written Prior Notice" provision, lies at the heart of this case. That provision directs local educational agencies to issue a Written Prior Notice to the parents of an IDEA-eligible child whenever they "propose[]" or "refuse[]" to initiate or change how they deliver that child's FAPE, including when they change that child's IEP. 20 U.S.C. § 1415(b)(3). As relevant here, these notices must include "a description of the action proposed or refused by the agency" and "an explanation of why the agency proposes or refuses to take the action." Id. § 1415(c)(1).

B. Origins of the Current Dispute

O.M. began her third-grade year at Falmouth Elementary School in September 2013. At that time, O.M.'s IEP team set about designing a new IEP that would take effect after her then-current IEP expired in October 2013. Ms. M., who had often expressed to Falmouth her concerns with O.M.'s literacy instruction at the school, initially requested that the IEP team hold a meeting to discuss her daughter's reading development in depth. Falmouth

- 5 -

hosted the meeting on October 3, 2013, after which it issued a Written Prior Notice to Ms. M. indicating that the School Department proposed "the introduction of a structured reading program to [O.M.]'s IEP." Ms. M. nonetheless reiterated her dissatisfaction with O.M.'s literacy instruction in later emails, demanding to know whether her current reading programs were based on scientific research, if her teachers held the requisite instructional qualifications in those programs, and how Falmouth proposed to measure her progress in them. See 20 U.S.C. § 1414(d)(1)(A)(iv) (noting that IEP services must be based on, to the extent practicable, "peer-reviewed research"); 34 C.F.R. § 300.320(a)(4) (stating the same).

The IEP team met again on October 31, 2013, at which time Falmouth proposed that O.M. be taught using a specific structured reading program called SPIRE. In the Written Prior Notice generated after that meeting and sent to Ms. M. on November 5, 2013, Falmouth similarly stated that it "proposed" (emphasis ours) to provide O.M. with sixty minutes of daily SPIRE instruction. That same day, however, Falmouth received a copy of a special education due process hearing request filed by Ms. M. with the Maine Department of Education. 20 U.S.C. § 1415(b)(6) (giving child's parents a right to bring a complaint to the state's educational agency regarding any matter relating to the child's IEP or a school's provision of a FAPE). The hearing request

- 6 -

maintained, in part, that O.M.'s current reading program was inappropriate under the IDEA. Ms. M. also wrote a letter, dated November 14, 2013, to Falmouth Special Education co-directors Polly Cowell and Gene Kucinkas identifying "several errors" in the November 5th Written Prior Notice and stating that she had "learned that the SPIRE program [was] not an evidenced based program, which ma[de] it inappropriate since it [was] not researched based." To emphasize the point, she also noted that she was "NOT in agreement with the proposal to use [SPIRE] for [O.M.]."

In response, Mr. Kucinkas proposed that Falmouth would retain Dr. Christopher Kaufman, a psychologist, to evaluate O.M.'s cognitive and academic abilities and offer suggestions for the IEP team to consider. Two days later, Falmouth sent O.M.'s new IEP, developed after the October 31 meeting, to Ms. M.[4] The IEP did not identify or discuss the SPIRE system, and instead stated that Falmouth would provide O.M. with eight hours and forty-five minutes of "Specially Designed Instruction" in "Literacy & Math" per week.

Mr. Kucinkas and Ms. M. eventually met in person on December 13, 2013, when they agreed that Falmouth would provide O.M. with certain educational and evaluative services. Along with several other promises not relevant here, Falmouth agreed to have

---

[4] The document notes that Falmouth sent the IEP to Ms. M. on November 20, 2013, but also states that its effective start date was November 4, 2013.

Drs. Kaufman and Gretchen Jefferson fully evaluate O.M.'s educational program. Mr. Kucinkas memorialized this agreement in a letter dated that same day. The letter, however, did not mention the SPIRE system. Apparently satisfied that her demands had been met, Ms. M. then voluntarily dismissed her hearing request with prejudice on December 17, 2013.[5]

Despite her previous reservations and communications with Mr. Kucinkas, Ms. M. apparently, and mistakenly, assumed that Falmouth was providing her daughter with SPIRE instruction. Falmouth, however, had abandoned its consideration of SPIRE after receiving Ms. M.'s November 14th letter objecting to its use. Ms. M. testified that she did not realize that Falmouth had made this decision until March 28, 2014, when O.M.'s IEP team met to discuss the results of Dr. Kaufman's and Dr. Jefferson's evaluations on March 28, 2014.

On April 17, 2014, Ms. M. told Falmouth that O.M. would start attending private tutoring sessions with an instructor trained in another structured reading system called the Lindamood Phoneme Sequencing ("LiPS") program, a step taken in accordance with Dr. Kaufman's evaluation.[6] On May 1, 2014, Falmouth

---

[5] The magistrate judge and district judge agreed that Ms. M. waived all her claims under the IDEA which arose between September 1, 2013 and December 17, 2013. Ms. M. does not dispute these determinations on appeal.

[6] Dr. Kaufman nonetheless observed in his evaluation that "nothing done by [O.M.'s literacy instructor] . . . would be either

- 8 -

reconvened the IEP team to again discuss O.M.'s reading issues. At the meeting, Falmouth declined Ms. M.'s request that it provide O.M. with LiPS instruction and again agreed to provide O.M. with SPIRE instruction, but not until the start of her fourth grade year in September 2014.

C. Procedural History

Ms. M. filed another due process hearing request on June 13, 2014 in which, among many other concerns and contentions, she chastised Falmouth for not providing her daughter with SPIRE instruction. Falmouth's failures, she continued, amounted to an IDEA violation because Falmouth had denied O.M. a FAPE.

The administrative officer who first heard Ms. M.'s complaints assumed that the contents of the October 31st Written Prior Notice were part of O.M.'s IEP, determined that the IEP called for SPIRE instruction, and that Falmouth had thus violated the IEP by not providing her with such instruction. He also determined, however, that this failure constituted a procedural violation that had not harmed O.M. in any educational sense. Consequently, the officer denied Ms. M.'s claim and ruled that Falmouth had provided O.M. with a FAPE. A magistrate judge, after Ms. M.'s submission of the case for review in federal court, issued

---

inappropriate or significantly inconsistent with the types of reading practice that's done for students who have reading disorders, regardless of the nature of their disability condition."

a report and recommended decision that essentially upheld this ruling.

Following Ms. M.'s objection to the magistrate judge's report and recommendation, the case proceeded to the district court. Notably, Falmouth did not file an objection to any part of the magistrate judge's report, including its conclusion that SPIRE formed a part of O.M.'s IEP. After its de novo review of the case, the court entered an order agreeing with the hearing officer's and magistrate judge's findings that Falmouth's SPIRE proposal should be read into O.M.'s IEP, noting that Ms. M.'s objection to providing SPIRE did not justify its failure to provide it as part of the IEP. The court disagreed, however, with their ultimate determinations that this failure constituted a procedural, and not a substantive, violation of her IEP and the IDEA. The court went on to conclude that the violation was material in nature and entered judgment for Ms. M. totaling $4,111.25, reflecting the cost of the LiPS tutoring sessions from May 5, 2014 to August 30, 2014.

## II. Discussion

Falmouth's principal argument on appeal is that the SPIRE reading system was never a part of O.M.'s IEP because the IEP team only mentioned its use in the Written Prior Notice generated after the October 31st meeting, a document which proposed, but did not promise, that the School Department would

provide specific educational programs to O.M. We agree, and therefore conclude that Falmouth complied with the terms of O.M.'s IEP and committed no IDEA violation.

### A. Waiver under the Federal Magistrates Act

To start, Ms. M. argues that Falmouth waived its argument that O.M.'s IEP did not call for SPIRE instruction after it did not object to the magistrate judge's recommended finding to the contrary. The relevant section of the Federal Magistrates Act states that:

> Within fourteen days after being served with a copy [of the proposed findings and recommendations of the United States Magistrate Judge], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

28 U.S.C. § 636(b)(1). "Absent objection . . . [a] district court has a right to assume that [the affected party] agree[s] to the magistrate's recommendation." Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir. 1985), cert. denied, 474 U.S. 1021 (1985). To that effect, "only those issues fairly raised by the objections to the magistrate's report are subject to review in the district court and those not preserved by such objection are precluded on

- 11 -

appeal." Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988).

According to Ms. M., Falmouth had notice that its failure to object to this aspect of the magistrate judge's recommended decision would result in such waiver since the decision contained a "notice" summarizing these rules and principles. Relying in part on our decision in School Union No. 37 v. United National Insurance Co., 617 F.3d 554 (1st Cir. 2010), Ms. M. argues that Falmouth made a "strategic decision" to forego any challenge to the IEP's content at the district court level and that we should restrict our review for clear error, despite the fact that Falmouth won under the magistrate judge's reasoning but then lost after the district court's de novo review of the entire case. We disagree.

In School Union No. 37, a school sued its insurer after the insurer refused to indemnify it for costs incurred while successfully defending an IDEA case. Id. at 558. Both parties filed cross-motions for summary judgment, after which a magistrate judge recommended that summary judgment be granted in the insurer's favor. Id. The magistrate judge concluded that although the underlying IDEA litigation involved a "Wrongful Act" triggering the school's insurance policy, the insurer properly denied the claim because the policy excluded coverage for claims "seeking [relief] other than money damages," which included claims for reimbursement under the IDEA. Id. (alteration in original). The

school timely objected to the magistrate's recommendations, but the insurer did not.  Id.  Soon after, the district court adopted the magistrate's recommendation in full and granted the insurer's motion for summary judgment.  Id.  On appeal, the insurers again defended against the school's claims by arguing that there had been no "Wrongful Act."  Id. at 563.  However, we "deem[ed the] argument forfeited and decline[d] to address it" because the insurer did not object to that aspect of the magistrate's recommendation.  Id. at 564.

Despite Ms. M.'s best efforts to convince us otherwise, hers is a different case presenting different factual circumstances which warrant a different result.  Falmouth successfully defended against Ms. M.'s claims before the hearing officer and the magistrate judge, and therefore had no immediate reason to appeal.  The record also indicates that once Ms. M. appealed the magistrate judge's recommendation, Falmouth did "fairly raise" the issue when it notified the district court, albeit in response to Ms. M.'s own objections, that it challenged "the Magistrate's Recommended finding . . . that the failure to provide SPIRE was an IDEA violation."  The district court, as evidenced by its "de novo determination of all matters adjudicated by the Recommended Decision," knew of this challenge as well since it expressly agreed with the magistrate judge that O.M.'s IEP "specif[ied the] use of the SPIRE literacy program."  Ms. M. v.

- 13 -

Falmouth Sch. Dep't, No. 2:15-CV-16-DBH, 2016 WL 3072250, at *1 (D. Me. May 31, 2016).

This conclusion also makes sense when Falmouth's arguments are compared with those of insurer in School Union No. 37. In that case, the insurer tried to bar the school's recovery by raising a discrete challenge to a conceptually separate provision of the indemnification policy despite not objecting to the magistrate judge's previous rejection of that challenge. Sch. Union No. 37, 617 F.3d at 564. By contrast, it is far more difficult for us to evaluate Ms. M.'s principal claim, that her daughter did not receive a FAPE, without examining the scope and content of O.M.'s IEP.

Our reasoning is also consistent with the Federal Magistrate Act's general purpose, which "is to relieve courts of unnecessary work." Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987) (quoting Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980)). Though the Act's waiver rule usually furthers that purpose by narrowing the number of issues between parties before a case gets to the district court, the rationale for applying the rule on appeal "dissipate[s]" once the district court, as it did in this case, considers and reviews the purportedly waived argument. Patterson v. Mintzes, 717 F.2d 284, 286 (6th Cir. 1983).

- 14 -

We also recognize that a strict application of the waiver rule in cases like this one would lead to rather harsh results for appellants.  Unlike in School Union No. 37, where the district court adopted every aspect of the magistrate judge's recommendation, the district court in this case only adopted part of the magistrate's recommendation and disagreed with its end conclusion.  Given this drastic change in outcome, the prudence of applying the waiver rule "dissipates" at an even more rapid rate. See McCarthy v. Manson, 714 F.2d 234, 237 n.2 (2d Cir. 1983) ("If the magistrate's decision is rejected or substantially modified, the parties may object to all or part of that judgment and hence preserve specific issues for appeal.").

For these reasons, we conclude that Falmouth "fairly raised" its argument disputing SPIRE's presence in O.M.'s IEP for the district court's consideration and has not waived its arguments to that effect on appeal.

B. The IEP's Content

Turning to the merits, we must decide whether O.M.'s IEP specifically called for SPIRE instruction.  Ms. M. characterizes this as a question of fact, and claims the district court's affirmative answer to this question is therefore subject to clear error review.  However, the district court ultimately determined that SPIRE was in the IEP only after it considered two predicate questions of law -- whether the term "Specially Designed

- 15 -

Instruction" is ambiguous and, assuming the term is ambiguous, whether a fact finder may resort to extrinsic evidence to resolve that ambiguity. Accordingly, we review both of these questions de novo. Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 76 (1st Cir. 2016).

Tackling these questions in order, we first note the IDEA requires that each qualifying child's IEP contain a "statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child." 20 U.S.C. § 1414(d)(1)(A)(i)(IV). Though the "statement" in O.M.'s particular IEP, which indicated that she would receive "Specially Designed Instruction" in reading and math, appears vague in the abstract, its precise meaning is made clear when viewed alongside complementary sections of the IDEA, Maine-specific rules and regulations carrying out the state's IDEA obligations, and other sources of regulatory guidance. See Auer v. Robbins, 519 U.S. 452, 462 (1997) (explaining that courts may look to the agency's interpretation of its own regulations when interpreting a statute and its implementing regulations).

For instance, rules within the Maine Unified Special Education Regulations ("MUSER") expressly categorize "Specially Designed Instruction" as a distinct type of special education service, noting that it refers to "instruction provided to children

. . . by an appropriately qualified special education professional or an appropriately authorized and supervised educational technician consistent with a child's IEP."  Me. Code R. 05-071, Ch. 101 § X.2(A)(2).  At the same time, the IDEA does not require schools to include specific instructional methods in an IEP.  See 20 U.S.C. § 1414(d)(1)(A)(ii)(I) (stating that the IDEA shall not be construed to require "that additional information be included in a child's IEP beyond what is explicitly required in this section").  While it is the U.S. Department of Education's "longstanding position" to allow IEP teams to address specific instructional methods in IEPs, there is no requirement that they do so.  See 71 Fed. Reg. 46,540, 46,665 (Aug. 14, 2006) ("There is nothing in the Act that requires an IEP to include specific instructional methodologies.  Therefore, consistent with [the IDEA], we cannot interpret . . . the Act to require that all elements of a program provided to a child be included in an IEP.").  Thus, the exclusion of any particular reading methodology in O.M.'s IEP appears deliberate and suggests that the IEP team intended to give Falmouth Elementary School officials a degree of flexibility when implementing O.M.'s educational program, subject to Section X.2(A)(2)'s constraints.

Construing the term in this way is also consistent with the inherent design of the IDEA.  The statute, for instance, refers to the IEP as the agreement embodied by the final, formal written

document and not, as Ms. M.'s argument implies, any tentative agreement reached by the IEP team. 20 U.S.C. § 1414(d)(1)(A)(i) (stating that "[t]he term . . . 'IEP' means a <u>written</u> statement" (emphasis added)); 34 C.F.R. § 300.324(a)(4)(i) (stating that any change or modification to a child's IEP should be made via a "<u>written</u> document" (emphasis added)).

The IEP document differs, for instance, from the Written Prior Notice, which the statute identifies as "a description of the action[s] proposed . . . by the [school and educational agency]." 20 U.S.C. § 1415(c)(1)(A). As opposed to the IEP, which is meant to present "a clear record of what placements and educational services were offered," <u>C.G. ex rel. A.S.</u> v. <u>Five Town Cnty. Sch. Dist.</u>, 513 F.3d 279, 285 (1st Cir. 2008), the Written Prior Notice serves to protect parents' rights under the IDEA by enabling them to contribute to the IEP development process and to later make informed decisions regarding whether to challenge an educational agency's discretionary choices in a later due process hearing, <u>see, e.g.</u>, <u>M.B. ex rel. Berns</u> v. <u>Hamilton Se. Schs.</u>, 668 F.3d 851, 861 (7th Cir. 2011); <u>J.W. ex rel. J.E.W.</u> v. <u>Fresno Unified Sch. Dist.</u>, 626 F.3d 431, 459 (9th Cir. 2010).[7]

---

[7] <u>See also</u> Me. Code R. 05-071, Ch. 101 § VI.2.I (noting that if the IEP team cannot reach a consensus on the IEP's terms, the local school department "must provide the parents with a prior written notice of the school's proposals or refusals, or both, regarding their child's educational program, and the parents have the right to seek resolution of any disagreements by initiating an

After viewing the IEP and Written Prior Notice requirements in tandem, it is evident that the IDEA envisions the IEP as an agreed-to general framework of a child's educational program that provides schools with a certain degree of flexibility in accomplishing the outlined objectives, while a Written Prior Notice is meant to spell out more specific, but not binding, proposals for implementing that framework.

We do not mean to suggest that a fact finder cannot or should not resort to extrinsic evidence to determine the meaning of an IEP term that is actually ambiguous. However, we need not now identify what makes an IEP term ambiguous or whether a fact finder should look to extrinsic evidence when encountering such an ambiguity.[8] Rather, we simply hold that in light of the statutory and regulatory background relevant to this case, the meaning of the term "Specially Designed Instruction" is clear enough such that our interpretive task does not require us to resort to other extrinsic evidence.[9]

---

impartial due process hearing or a State complaint investigation").

[8] For example, it is unnecessary for us to determine what role Ms. M.'s November 14th letter, which noted her objections to the SPIRE program, should play in our analysis.

[9] In light of our finding that the IEP is not ambiguous, the Second Circuit's recent decision in A.M. v. New York City Dep't of Educ., ___ F.3d ___, 2017 WL 83384 (2d Cir., Jan. 10, 2017) is irrelevant to our analysis.

### III. Conclusion

Since we hold that O.M.'s IEP did not specify that she was to receive SPIRE instruction during her third-grade year, and because Ms. M. does not contend that Falmouth violated her daughter's IEP in any other way, it necessarily follows that Falmouth did not breach the IEP's terms and thus did not violate O.M.'s right to a FAPE. Accordingly, we REVERSE the district court's determination that Falmouth violated O.M.'s IEP and VACATE the accompanying damages award. Each party shall bear its own costs.[10]

---

[10] Section 1415 of Title 20 allows prevailing defendants in IDEA cases to recover fees from the parent or the attorney of a parent in certain rare circumstances. For instance, a prevailing school district may recover attorney's fees against the parent's attorney where the complaint is "frivolous, unreasonable, or without foundation." 20 U.S.C. § 1415(i)(3)(B)(i)(II). Attorney's fees may also be awarded against a parent or their attorney "if the parent's complaint or subsequent cause of action was presented for any improper purpose." Id. § 1415(i)(3)(B)(i)(III). Falmouth has not asked that we invoke these provisions. In the absence of any argument to that effect, we therefore decline to apply them to this case.