In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 18-1209

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KEYCIE A. STREET,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:15-CR-228-PP-3 — **Pamela Pepper**, *Judge.*

_____

ARGUED OCTOBER 25, 2018 — DECIDED MARCH 1, 2019

_____

Before ROVNER, HAMILTON, and BARRETT, *Circuit Judges.*

HAMILTON, *Circuit Judge*. On October 24, 2015, law
enforcement officers in Pewaukee, Wisconsin were searching
for two African-American men who moments before had
committed an armed robbery. The robbers had been tracked
to the parking lot of a nearby Walmart store. An officer
stopped and questioned appellant Keycie Street, the only
African-American man in the crowded Walmart. Street was
not arrested then, but during the stop, he provided

identifying information that helped lead to his later arrest for the robbery.

Street contends that the stop violated his Fourth Amendment rights because he was stopped based on just a hunch and his race and sex. We disagree. The officers stopped Street based on much more information than his race and sex. They did not carry out a dragnet that used racial profiling. Rather, the police had the combination of Street being where he was, when he was there, and one of a handful of African-American men on the scene, thus fitting the description of the men who had committed an armed robbery just minutes before. That information gave the officers a reasonable suspicion that Street may have just been involved with an armed robbery, thus authorizing the stop. See generally *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Arthur*, 764 F.3d 92, 97–98 (1st Cir. 2014) (affirming denial of motion to suppress results of *Terry* stop in similar robbery case). We conclude by addressing a procedural issue that arose from the district court's reference of Street's motion to suppress to a magistrate judge for a report and recommendation under 28 U.S.C. § 636(b). The magistrate judge recommended denying the motion. The government did not need to file its own objection to the recommendation to argue that the motion to suppress should also be denied on another theory that the magistrate judge had rejected. We affirm Street's conviction.

I.   *Facts and Procedural History*

A.  *The Robbery*

On October 24, 2015, a cellular telephone store in Pewaukee, Wisconsin was robbed at gunpoint by two African-American men wearing black hooded sweatshirts.

During the robbery, the lone store employee managed to press a silent alarm. Before police arrived, the robbers stole more than thirty cellular telephones and fled in a white sport utility vehicle. One of the telephones they stole was equipped with an active GPS tracking device. Officers began tracking the GPS signal. Approximately five minutes after law enforcement learned of the robbery, the signal indicated the stolen telephone had stopped at a nearby Walmart.

Officers from several jurisdictions began arriving at the Walmart. The first officers to arrive spotted a white SUV parked awkwardly to the side of the store. The officers saw, between the SUV and the store entrance, three African-American men walking together toward the entrance. One was wearing a red parka or raincoat. When the officers approached, one of the men who was not wearing red took off running. Both officers chased him on foot. The fleeing man, later identified as Demonte Oliver, was apprehended quickly. But by the time the officers returned with Oliver, the other two men had disappeared. The officers then focused on finding those two men as quickly as possible.

After arresting Oliver, officers approached the abandoned SUV. In plain view, they saw the stolen cellular telephones, the cash drawer from the store, and a handgun. In other words, the officers knew they were in the right place. One officer speculated over the radio that one of the men he had seen might have entered the Walmart store to try to evade police. That officer also told Deputies Niles and Knipfer of the Waukesha County Sheriff's Department of this possibility after they arrived on the scene.

B.  *The Stop of Defendant Street*

While only one suspect was in custody, officers worked with Walmart staff to conduct a controlled evacuation of the store to try to locate the other suspects. To control the evacuation, the officers blocked all but one exit. While the preparations were still underway, the officers organizing the evacuation learned that a second man (later identified as the getaway driver for the robbery) had been arrested in a nearby marsh. The officers continued to prepare a controlled evacuation and search of the store. At that time, they could not be sure whether the two arrested men were actually the two robbers, nor did they know whether the two robbers had worked with a getaway driver. Also, the officers had not yet located the third man whom officers had first seen in the trio walking away from the abandoned SUV.[1]

The officers then ordered all shoppers and employees to exit the Walmart store. Deputy Niles was outside the store and spotted Keycie Street in the crowd leaving through the single unlocked exit. Street's clothing did not match the description of the suspect(s) they were looking for, but he was the only African-American man among the crowd who was not a Walmart employee. Deputy Niles suggested to his lieutenant that they stop people leaving the store for brief questioning before they lost the opportunity. He specifically pointed out Street as someone who should be interviewed because he partially matched the description of the suspects and was the only person in the crowd who did. The lieutenant agreed and told Deputy Knipfer to stop and identify Street.

---

[1] The man in the red jacket turned out to have been a Walmart employee, but the officers did not know that at the time.

Deputy Knipfer was aware that the man they were looking for was described as possibly wearing red or dark clothing, but he also knew there was "the possibility that [a suspect] could have obtained different clothing while inside the store."

Deputy Knipfer approached Street and told him the officers were investigating a robbery and wanted to rule him out as a suspect. Street was cooperative. He gave the deputy his full name, date of birth, and home address. The deputy used that information to check for outstanding warrants. Street also told the deputy that friends had dropped him off at the store to buy a video game, which he was carrying in a Walmart bag, and that his friends would be back to pick him up soon. After finding no outstanding warrants, Deputy Knipfer told Street he was free to leave. Deputy Knipfer then went inside the store to help with the ongoing search. Knipfer testified that his entire exchange with Street took approximately ten to fifteen minutes.

Not long after the stop of Street, officers reviewed recordings from Walmart security cameras. They confirmed that three African-American men had exited the white SUV when it arrived. One of the men appeared to be Keycie Street. Officers went back to the parking lot to search for Street but could not find him. Officers then used the identifying information Deputy Knipfer obtained from the stop to obtain photographs of Street from the Illinois Department of Transportation and from an internal law enforcement database.

The two men who had been arrested outside the Walmart, Demonte Oliver and Romero Eddmonds, admitted their involvement in the robbery. They also told detectives that a third man they knew as "Lil Key" and "Little One" was also a part of the robbery but that they did not know his real name.

Oliver identified Keycie Street from his Department of Transportation photograph. Eddmonds separately identified Street in the photograph from the law enforcement database. An arrest warrant was issued for Street, who soon surrendered. Street's DNA matched DNA on a bottle that officers recovered from the abandoned SUV.

C. *District Court Proceedings*

Street was indicted for Hobbs Act robbery under 18 U.S.C. § 1951. He moved to suppress the identifying information he had given to Deputy Knipfer and the additional evidence the police had obtained by using that information, including the DNA evidence and the identifications by Oliver and Eddmonds. The district judge referred the motion to suppress to Magistrate Judge Jones, who held an evidentiary hearing to prepare a report and recommendation. Street argued that Deputy Knipfer had stopped him based on only a hunch, without the reasonable suspicion required by the Fourth Amendment. Street pointed out that his clothing did not match the suspects' and that he was not acting suspiciously as he left the store. He also argued that because the police already had two suspects in custody, they had no reason to believe there was a third suspect involved in the robbery and thus had no reason to continue the investigation when they stopped him. Street contended that the officers stopped him only because his race and sex matched the description of the suspects, which he argued was not enough to justify an investigatory stop.

The magistrate judge agreed that the officers did not have reasonable suspicion to stop Street because the stop was based on only a "hunch" that if a third person had been involved in the robbery, he would also have been an African-

American man. The magistrate judge recommended the motion to suppress be denied, though, on the ground that the evidence used to prosecute Street was too attenuated from the constitutional violation to justify suppression and that the stop was made in good faith.[2]

Street then filed an objection to the magistrate judge's recommendation. The government did not file its own objection, but its response to Street's objection argued that the stop was legal. District Judge Pepper adopted the magistrate judge's recommendation. The government then asked the district judge to reconsider whether the officers had reasonable suspicion to stop Street. The judge denied that motion. Street then entered a guilty plea on the condition that he could revoke the plea if he successfully appealed the denial of his motion to suppress.

II.  *Analysis*

Street argues on appeal that the district court erred by applying the attenuation doctrine to deny his motion to suppress. He also argues that the government waived the argument that the stop was constitutional because it did not file its own objection to the magistrate judge's recommendation. We explain first why the stop of Street was based on reasonable suspicion and thus constitutional, without reaching the attenuation theory. We then explain briefly why the government did not need to file its own objection to the magistrate judge's recommendation in its favor.

---

[2] The magistrate judge also found in the alternative that the evidence should not be suppressed because the discovery of Street's identity was inevitable. The government has not pressed this rationale on appeal, so we do not consider it.

A.  *The Terry Stop of Defendant Street*

The Fourth Amendment prohibits unreasonable searches and seizures. If Deputy Knipfer had constitutional authority to stop and question Street, it was on the strength of *Terry v. Ohio*, 392 U.S. 1 (1968). While this stop was peaceful and cooperative, it was not consensual. An investigative stop under *Terry* imposes a substantial intrusion on a person's liberty and dignity. *Terry* stops cannot be made lightly. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. * * * It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Id.* at 16–17; see also *United States v. Lopez*, 907 F.3d 472, 478 (7th Cir. 2018) ("With the authority to stop comes the authority to require the subject to submit to the stop, and to use reasonable force to make him submit.").

To seize a person for a brief investigatory *Terry* stop, an officer must "have reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010). Reasonable suspicion requires "more than a hunch but less than probable cause." *United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013), quoting *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). The suspicion "must be based on specific, articulable facts which, judged in light of the officers' experience, would justify the intrusion." *United States v. Marrocco*, 578 F.3d 627, 633 (7th Cir. 2009); see also *Terry*, 392 U.S. at 21 ("in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion").

To determine whether a *Terry* stop was reasonable, we "must consider the totality of circumstances known to the officer at the time of the stop." *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996). If the stop was unreasonable under this standard, "unless one of various exceptions applies, exclusion will run not only to the unconstitutionally obtained evidence, but also to the fruits of that evidence—the so-called fruit of the poisonous tree." *United States v. Conrad*, 673 F.3d 728, 732 (7th Cir. 2012).

The district court held that the officers lacked reasonable suspicion to stop Street and thus violated the Fourth Amendment. However, the district court denied the motion to suppress on the grounds that the attenuation doctrine applied. That doctrine allows a court to deny a motion to suppress when the causal connection between the constitutional violation and the evidence obtained is remote or suppression would not serve the interest protected by the constitutional guarantee. *Hudson v. Michigan*, 547 U.S. 586, 593 (2006) (violation of knock-and-announce rule in executing search warrant did not require suppression of evidence seized); *United States v. Carter*, 573 F.3d 418, 422 (7th Cir. 2009) ("the exclusionary rule should not apply when the causal connection between illegal police conduct and the procurement of evidence is 'so attenuated as to dissipate the taint' of the illegal action"), quoting *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990).

On appeal, Street argues that the district court erred by applying the attenuation doctrine. The government contends the doctrine should apply but need not be relied upon because the officers had reasonable suspicion to make the stop in the first place. "When reviewing a district court's decision on a motion to suppress, we review findings of historical fact

for clear error and conclusions of law (as well as mixed questions of law and fact, such as determinations of reasonable suspicion) de novo." *United States v. Ruiz*, 785 F.3d 1134, 1140–41 (7th Cir. 2015); *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Street contends the officers stopped him solely because his race and sex matched those of the two robbers. He argues that Deputy Knipfer stopped him on the mere hunch that, if a third person had been involved, he would also have been an African-American man. Street's general point about race and sex is well taken, but we conclude it does not apply to his case. The record does not support his attempt to have us view this stop in such isolation.

When considering whether an officer had reasonable suspicion for a *Terry* stop, we "look at the totality of the circumstances of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). This approach recognizes that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.*, quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981).

*Terry* does not authorize broad dragnets, but it also does not require perfection or precision. Without more, a description that applies to large numbers of people will not justify the seizure of a particular individual. See, e.g., *United States v. Turner*, 699 A.2d 1125, 1128–29 (D.C. 1997). This is especially true where the description is based primarily on race and sex, as important and helpful as those factors can be in describing a suspect. See, e.g., *United States v. Foster*, 891 F.3d 93, 105 (3d

Cir. 2018) (vague descriptions, including race and sex, "without more, are not enough to support reasonable suspicion"); *Brown v. City of Oneonta*, 221 F.3d 329, 333–34 (2d Cir. 2000) ("a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure"); *United States v. Montero-Camargo*, 208 F.3d 1122, 1134 n.21 (9th Cir. 2000) (en banc) (acknowledging importance of "the use of racial or ethnic appearance as *one* factor relevant to reasonable suspicion or probable cause when a particular suspect has been identified as having a specific racial or ethnic appearance"). The totality of circumstances, however, may provide additional and reasonable limits, particularly with respect to place and time, so as to allow a stop based on a fairly general description.

Here, the totality of the circumstances shows reasonable suspicion for stopping Street to investigate him. The police were searching for suspects who had committed an armed robbery only minutes before. They had more general descriptions than was ideal. That's not unusual when events unfold so quickly. But a lack of better, more detailed descriptions does not mean officers must disregard the limited information they do have. See, e.g., *Foster*, 891 F.3d at 104–06 (affirming denial of motion to suppress; armed robbery suspect was described only as black man fleeing on foot, and police had reasonable suspicion to stop the only black man on foot in vicinity); *United States v. Arthur*, 764 F.3d 92, 97–98 (1st Cir. 2014) (affirming denial of motion to suppress; armed robbery of cell phone store by two black men who fled on foot led to seizure of two black men walking away from robbed store); *Turner*, 699 A.2d at 1128–30 (reversing grant of motion to suppress; description of suspect as black male wearing black jacket and blue jeans was sufficient to stop nearby suspect even though

description also resulted in stop of second suspect who fit description: "we have routinely held that an imperfect description, coupled with close spatial and temporal proximity between the reported crime and seizure, justifies a *Terry* stop"); 4 Wayne R. LaFave, *Search & Seizure* § 9.5(h) at 760 (5th ed. 2018) ("But it cannot be said that there must always be several points of comparison … the most important consideration is whether the description is sufficiently unique to permit a reasonable degree of selectivity from the group of all potential suspects.").

The analysis in *Arthur* is especially helpful. In *Arthur*, two armed African-American men described as wearing dark, heavy clothing robbed a telephone store and fled on foot. 764 F.3d at 96. An officer patrolling the area was informed only of this general description of the robbers. He drove down the street where the men were last seen and turned onto an adjacent street. He saw two African-American men walking in a direction that led away from the robbery. The two men were only an eighth of a mile from the store. They were the only pedestrians the officer had seen, and he spotted them approximately five minutes after the police were dispatched to the scene. The officer approached the men with his hand on his gun holster, told them he was investigating an armed robbery, and ordered them to show him their hands. *Id.* at 97. That amounted to a seizure under the Fourth Amendment. After being charged with the robbery, one of the men moved to suppress the evidence against him, claiming the officer lacked reasonable suspicion to make the stop. The district court denied the motion.

The First Circuit affirmed, noting that the officer "had received a reliable, though generic, description of the number

of suspects and their race, gender, clothing, and approximate location, as well as information about the direction in which they were heading." 764 F.3d at 97. The First Circuit emphasized: "Ubiquitous or vague physical descriptions or general locations, without more, are not enough to support reasonable suspicion." *Id.* at 99. Considering the totality of the circumstances, however, the court found not only that the stop was proper but that "a failure to stop the men and question them briefly would have verged on a dereliction of duty." *Id.* at 98.

Here, as in *Arthur*, the order to stop Street was based on reasonable suspicion that went well beyond race and sex. As in *Arthur*, the officers had only limited physical descriptions of the suspects, but timing, location, and reliable information about the suspects' movements made it reasonable to stop Street. The officers knew the men who robbed the store were armed and had been described as African-American. They knew that the GPS in one stolen telephone had led them hot on the robbers' heels to the Walmart parking lot, where they found the abandoned getaway car with the stolen goods, cash, and a gun. The first officers on the scene saw three African-American men walking away from that vehicle, and one of the men ran in response to the police. See *District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) (unprovoked flight upon noticing the police is certainly suggestive of wrongdoing and can be treated as suspicious behavior), quoting *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000).

The magistrate judge and district judge focused on the fact that when Street was stopped, two men had already been taken into custody. Street argues that the officers could only speculate about whether a third person had been involved in the robbery, let alone whether a third person would also have

been an African-American man. We respectfully disagree with the premise of this logic. At the time Street was stopped, the officers could not be certain the two men they had arrested were actually the two robbers. Nor could they be sure that only two men were involved in the robbery. There was also good reason to look for the third African-American man who had walked away from the getaway car.

To be clear, officers are not permitted to stop a person based solely on his race and sex. See *Whren v. United States*, 517 U.S. 806, 813 (1996) ("the Constitution prohibits selective enforcement of the law based on considerations such as race"); *Brown*, 221 F.3d at 334 ("a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure"); *United States v. Swindle*, 407 F.3d 562, 569–70 (2d Cir. 2005) ("race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop"); *Montero-Camargo*, 208 F.3d at 1134 n.21 (9th Cir. 2000) ("a stop based *solely* on the fact that the racial or ethnic appearance of an individual matches the racial or ethnic description of a specific suspect would *not* be justified"). But race and sex are basic and common elements of descriptions of people. We do not expect officers to ignore such defining features. See *United States v. Morrison*, 254 F.3d 679, 682 (7th Cir. 2001) ("When police are searching for a bank robber described as a black male, it is reasonable for them to be looking for a black man.").

Street was the only African-American man in the crowd leaving the Walmart during the evacuation. His clothing did not fit the description from the robbery, but the officers could reasonably think the third man had had a chance to change clothes in the store. Under all of these circumstances—hot

pursuit of fleeing armed robbers to the Walmart, the general descriptions of the robbers, the first officers' observation of the three men seeming to walk away from the getaway car, and the fact that Street seemed to be the only man leaving the Walmart who fit the general descriptions—the officers had specific, articulable reasons that made it reasonable to stop Street to investigate.

If the officers had arbitrarily stopped Street on the basis of his race and sex, as Street contends, this would be a very different case. It would be a mistake to read this decision as saying such a vague description of the robbers would be enough to justify a *Terry* stop of any African-American man the police encountered. But Street was in the right place at the right time, as far as the police were concerned. They had reason to be looking—there and then—for another African-American man, and Street was the only African-American man in the crowd leaving the store.

Street also argues that the stop was unreasonable because Deputy Knipfer did not himself have reasonable suspicion to make the stop and nothing indicates that Deputy Knipfer knew he was looking for a third suspect. Because the record does not show Knipfer had reasonable suspicion to make the stop, Street reasons, the stop was based on nothing more than a hunch. The collective knowledge doctrine refutes this argument.

When more than one police officer is involved in the reasonable-suspicion analysis, courts consider their collective knowledge. "The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer … even if the officer himself does not have firsthand knowledge of facts that amount to the necessary

level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010) (Constitution permits officers to stop a person based on "wanted" bulletins issued by other law enforcement agencies even if officer making stop lacks personal knowledge of basis), citing *Hensley*, 469 U.S. at 232.

To rely on collective knowledge to support a stop, we have interpreted *Hensley* to require that "(1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Id.*; see also *United States v. Wheeler*, 800 F.2d 100, 103 (7th Cir. 1986) (establishing three-part collective knowledge test based on *Hensley*, 469 U.S. 221), overruled on other grounds by *United States v. Sblendorio*, 830 F.2d 1382 (7th Cir. 1987).

Here, all three elements were satisfied. First, Deputy Knipfer relied on his fellow officers when he stopped Street to identify him. See *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (noting "settled principle that law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable"), citing *Hensley*, 469 U.S. at 232. Next, as discussed above, the officers Knipfer was working with had articulable reasons to stop Street. Finally, the stop was no more intrusive than one the requesting officers could have conducted. Deputy Knipfer asked Street only for his name, address, date of birth, and his reason for being at Walmart before running a warrant check and letting him go.

In sum, the totality of the circumstances known to the officers at the time of the stop rose to the level of reasonable suspicion to conduct a brief investigatory stop of Street. Because the officers had reasonable suspicion to stop Street and identify him, they were entitled to use that information to pursue the investigation further, leading ultimately to Street's arrest and conviction.

B.  *Objection by Prevailing Party?*

Street has also argued on appeal that we should not even consider the government's arguments in favor of the *Terry* stop because the government waived that contention by failing to file its own objection to the magistrate judge's recommendation. That recommendation was that the district judge find the stop unconstitutional but deny the motion to suppress based on attenuation. We disagree with this waiver argument. Much as an appellee is free to argue alternative grounds to support a judgment without filing a cross-appeal, the government was free to argue different grounds supporting the same bottom-line recommendation: denial of the motion to suppress.

For certain pretrial matters, including motions to suppress, a district judge may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court" of such matters. 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59 (b)(1). The parties may file objections to the magistrate judge's proposed findings of fact and recommendation with the district court. Fed. R. Crim. P. 59(b)(2). Failing to object to the recommendation "in accordance with this rule waives a party's right to review." *Id.*; see also *Video Views, Inc. v. Studio*

*21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986) (failing to object to recommendation "waives the right to appeal all issues, both factual and legal"). In both civil and criminal cases, requiring a written objection prevents parties from "'sandbagging' the district judge by failing to object and then appealing." *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998), quoting *United States v. Brown*, 79 F.3d 1499, 1504 (7th Cir. 1996). This waiver rule is not jurisdictional, though, and we have recognized exceptions when enforcing it would "defeat the ends of justice." *Video Views* 797 F.2d at 540; see also *Brown*, 79 F.3d at 1505 (excusing waiver of challenge to recommendation to deny substitution of counsel when attorney who defendant claimed was inadequate had not filed objection).

Rule 59(b)(2)'s operative language—"Failure to object in accordance with this rule waives a party's right to review"— does not prevent a district judge from reviewing a recommendation on her own initiative. See *Thomas v. Arn*, 474 U.S. 140, 154 (1985) ("The district judge has jurisdiction over the case at all times. * * * [W]hile the statute [§ 636(b)] does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard."); *United States v. Raddatz*, 447 U.S. 667, 680 (1980) ("While the district court judge alone acts as the ultimate decisionmaker, [§ 636(b)(1)(B)] grants the judge the broad discretion to accept, reject, or modify the magistrate's proposed findings."); *Schur v. L.A. Weight Loss Centers, Inc.*, 577 F.3d 752, 760 (7th Cir. 2009) ("although the district judge *must* make an independent determination of a magistrate judge's order upon objection, he is not *precluded* from reviewing a magistrate judge's order to which a party did not object"). The district judge was free to consider any issues she wished to.

The rule's waiver language does not distinguish between the prevailing party and the losing party, and Street quotes the general language from *Video Views* to argue that the government waived its right to review the magistrate judge's recommended finding that the stop violated the Fourth Amendment. We disagree.

The waiver rules in Rule 59(b)(2) and its civil counterpart, Fed. R. Civ. P. 72(b)(2), seem to come up on appeal only when the party unhappy with the magistrate judge's bottom-line recommendation has failed to object at all or has objected on grounds different from those argued on appeal. We have written that this rule applies to "any party" who does not object to the magistrate judge's recommendations, but we have found no precedent from our circuit prohibiting *prevailing* parties from arguing on appeal a rationale that the magistrate judge rejected.

Other circuits that have addressed this issue agree that "a party, who substantially prevails in a magistrate judge's recommendation, does not waive the right to appeal secondary issues resolved against him by failing to object to the recommendation," for such a requirement would frustrate the purpose of a waiver rule. *Vanwinkle v. United States*, 645 F.3d 365, 371 (6th Cir. 2011), quoting *Souter v. Jones*, 395 F.3d 577, 586 (6th Cir. 2005); see also *M. v. Falmouth School Dep't*, 847 F.3d 19, 26 (1st Cir. 2017) (prevailing party before magistrate judge did not waive secondary argument on appeal by failing to object to magistrate judge's findings when district court was aware of argument); *Cooper v. Taylor*, 103 F.3d 366, 373 (4th Cir. 1996) (en banc) ("Although we and the Supreme Court have long held that the losing party before the district court and before a magistrate must preserve every claim it intends to

raise on appeal lest it waive those claims … we have consistently held that the prevailing party in either forum need not advance on appeal every error it believes was committed by the magistrate or court in the course of ruling in that party's favor.") (Luttig, J., concurring).

In the absence of more specific language in § 636(b) and Rule 59(b)(2), we seek guidance from the parallel (and more frequently litigated) problem of distinguishing between an appellee's arguments that require a cross-appeal and alternative arguments for affirming the judgment in the appellee's favor.

When a prevailing party raises an alternative argument on appeal that was unsuccessful before the district court without a cross-appeal, the appellate court must consider whether the argument will produce the same outcome as the district court's order. *United States v. Terzakis*, 854 F.3d 951, 954 (7th Cir. 2017) (holding appellant was not required to cross-appeal or to obtain certificate of appealability to reargue grounds the district court rejected because the theory was part of the record and did not propose to expand his rights under the judgment), citing *Jennings v. Stephens*, 135 S. Ct. 793 (2015); see also *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 333 (1980) ("A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it.").

Rule 59(b)(2) differs from the rule for cross-appeals in that the objection requirement is not jurisdictional and the district judge can act *sua sponte* to review the findings of the magistrate judge. Those differences do not favor a more rigorous waiver rule, however. The similar rationales for and parallel applications of the two rules lead us to conclude that Rule

59(b)(2) does not require the prevailing party to object to the reasoning of the magistrate judge if the recommendation is a decision in the party's favor and the prevailing party seeks no more favorable relief.

The government thus did not waive the right to argue the stop was legal. Although the magistrate judge recommended the motion be denied on grounds the government did not believe were strongest, the government did not need to object merely because it would have preferred the alternative reasons it offered for the ruling in its favor.

The judgment of the district court is AFFIRMED.